DECISION.
{¶ 1} Appellants Mamie Brown, Louis Wilkinson, and Dawn Mitchell Wilkinson appeal the judgment of the Hamilton County Juvenile Court granting permanent custody of Isaiah Wilkinson, Dominique Wilkinson, Loucareia Wilkinson, and Malik Wilkinson to the Hamilton County Jobs and Family Services (HCJFS). We affirm.
 {¶ 2} Isaiah, born July 16, 1993, Dominique, born August 25, 1994, Loucareia, born January 17, 1997, and Malik, born December 24, 1997, are the children of Dawn Wilkinson. One alleged father of Isaiah is Michael Harris, whose last known address was Louisiana. He has never been involved in the life of Isaiah, nor has he supported Isaiah, and he did not appear at any of the custody proceedings. Louis Wilkinson is an alleged father of Isaiah and is the legal father of Dominique, Loucareia, and Malik. Mamie Brown is the paternal grandmother of the children.
 {¶ 3} Before April 2001, all four children were placed in the legal custody of Brown. Dominique and Isaiah were placed with Brown by the Kentucky Children's Services. In April 2001, the children were placed in the interim custody of HCJFS, due to the sexualized and aggressive behaviors of Loucareia at her Head Start preschool.
 {¶ 4} At the permanent-custody hearing, in May 2003, Loucareia's Head Start teacher, Thomasina Sloan, testified. Sloan stated that, at the start of the 2000-2001 school year, Loucareia's grandmother brought and picked up Loucareira from school, but that, after Christmas, Loucareia's father began bringing her. At that point, Sloan observed that Loucareia's behavior changed. Sloan testified that Loucareia began to engage in inappropriate behaviors, including fondling herself, asking other children if they wanted to pull her pants down, and attempting to urinate on others.
 {¶ 5} Sloan enlisted the aid of the school psychologist, Mona Burts-Beatty, who observed Loucareia. Burts-Beatty testified that, by April 2001, Loucareia's behaviors had increased to a crisis level, and that the school felt obligated to call HCJFS about suspected abuse.
 {¶ 6} Mary Eck, a sex-abuse investigator for HCJFS, testified that she interviewed Loucareia and her siblings in April 2001. During Loucareia's interview, Loucareia went into the bathroom and rubbed herself against the toilet-paper dispenser, began gyrating her hips, and then stuffed toilet paper into her vaginal cavity. Eck testified that she also interviewed Isaiah, but that during the interview he began to "decompensate" and stated that he was going to harm himself. He was eventually taken to the Children's Hospital psychiatric unit. Eck testified that Dominique was difficult to interview, as she could not be engaged and began crawling around on the floor. Later that day, Dominique tested positive for chlamydia. Eck also briefly interacted with Malik.
 {¶ 7} After the interviews, Eck and Camilla Barker, the HCJFS caseworker at the time, met with Brown. Eck testified that they expressed to Brown their concerns about the father residing in the home with the children. Eck testified that Brown stated that she needed her son Wilkinson in the home with her to help with the children. Brown reported that Wilkinson was there 24 hours a day, seven days a week because of her church schedule.
 {¶ 8} Eck testified that HCJFS was concerned about Wilkinson's presence in the home because he was a substantiated sexual offender. Wilkinson and his wife, Dawn, had had two other children, twins born October 5, 1998, permanently removed from their custody in 2000, in part because Wilkinson admitted that he had sexually abused one of Dawn's older children. As a result of the earlier case, Wilkinson was supposed to have been in sexual-offender treatment. Wilkinson reported at the meeting that he had stopped attending counseling.
 {¶ 9} Eck testified that it was her understanding that Brown had been told by the Kentucky Children's Services when Isaiah and Dominique were placed with her that Wilkinson was not to have unsupervised contact with the children. But Brown insisted that the Kentucky Children's Services had told her that Wilkinson should help her with the children. HCJFS obtained an emergency order of custody on April 10, 2001.
 {¶ 10} The mother, Dawn Wilkinson, has had an extensive criminal history and a history of substance abuse. She has been diagnosed as a paranoid schizophrenic and has been hospitalized numerous times. At the time of the permanent-custody hearing, she was being held in the Hamilton County Justice Center for a recent probation violation. She was present during some but not all of the trial proceedings.
 {¶ 11} Dawn testified that she had not cared for Isaiah, Loucareia, Dominique, or Malik for the last five or six years. She testified that she had lost custody of all her children. She was not seeking the return of the children to her, but stated that her preference was for Brown to retain custody of the children so that she could continue to visit them. Dawn testified that when her daughter Tomeka was twelve years old, Wilkinson, who is not Tomeka's father, sexually abused Tomeka. Wilkinson had told Dawn about the incident when it happened, stating to her that he had made a mistake.
 {¶ 12} Sandra Elliott, an expert in clinical psychology, testified that she had completed psychological and parenting evaluations of both Brown and Louis Wilkinson. Elliott testified that it was her opinion that Brown had a paranoid personality disorder. Elliott stated in her report to the court that Brown lacked insight and that "her externalization of responsibility for any of the children's problems as well as her failure to see the risks of placing them in certain situations, such as with her son, make it unlikely that these children will be cared for safely and appropriately if returned to her home."
 {¶ 13} Dr. Elliott testified that Wilkinson openly talked about being a career criminal. Dr. Elliott reported that Wilkinson had a history of physical violence and numerous arrests. He told Elliott that rules applied to other people but not to him, and that he had been on both ends of a gun many times. Wilkinson testified that he had ten children and did not pay child support. He told Elliott that he had had to sell drugs to support his family. When asked at the custody hearing how he supported himself, he stated that he was a professional gambler. He stated that he wanted his mother to regain custody of the children.
 {¶ 14} Dr. Daniel Glynn, Brown's psychologist, testified that it was his opinion that Brown would be unfit to supervise or act as a parental figure for her grandchildren. Glynn testified that Brown seemed angry and depressed, and that she was more focused on fighting the system rather than on securing a safe environment or a better quality of life for her grandchildren. Dr. Glynn reported that Brown often exhibited low energy, and that she would require assistance with housing and money, and with managing the children if she retained custody. He also testified that Brown suffered from high blood pressure and walked with a cane.
 {¶ 15} Dr. Glynn testified that Brown had stated that her son should take more responsibility for the children, but that she also had stated that he did not know how to be a father and that she had concerns about him caring for them. Dr. Glynn also testified that one goal of Brown's therapy was to help her become more aware of her own past sexual abuse and how that affected her view of the children.
 {¶ 16} Brown testified that she did not think that either Loucareia or Dominique had any behavioral issues before being removed from her home. Brown also testified that she did not believe the medical test result from April 2001 indicating that Dominique had chlamydia, because there was never a second opinion.
 {¶ 17} Brenda Merrick, a child therapist who worked with Dominique, testified that Dominique had been diagnosed with reaction-attachment disorder, which resulted from "early mistreatment or nonresponsive treatment of caretakers to a child so that the surrounding environment appears to have a hostile quality." Merrick testified that Dominique had been hospitalized for acting aggressively and because of her inability to contain herself. Merrick testified that, at the home of her foster family, Dominique would walk around at night due to nightmares and anxiety. Merrick also noted that Dominique had been told by her father not to talk to Merrick about their family visits.
 {¶ 18} Merrick testified that, at the time of the custody hearing, Dominique had made significant improvement behaviorally. She reported that Dominique was very attached to her foster parents and would be integrated into regular educational classes in the next school year. Merrick also stated that while Wilkinson had apparently instructed Dominique to tell her lawyer that she wanted to go home with her biological family, Dominique sought assurance from Merrick that she would not have to leave her foster family. Merrick testified that Dominique spoke of her foster family as the "best thing" that had ever happened to her, because they protected her and sent her to school.
 {¶ 19} Barbara Dale, a HCJFS family guide, supervised one visit of the children with their mother, as well as many other visits with their father and grandmother. She testified that the children were always happy to see their parents and grandmother, and that their interactions were caring and appropriate. Dale testified that the children were bonded to Brown and to each other. But Dale also stated, "I think these children have a bond that's very defensive. They stick together because they know they've got to stick together."
 {¶ 20} Randall Frost, Isaiah's therapist, testified that Isaiah had had acting-out behaviors in his foster home, including setting fires and burning papers. Frost testified that Isaiah was a "very, very angry child." Isaiah had been hospitalized at Children's Hospital for one month due to increasingly destructive behaviors. Frost testified that Isaiah had conflicts and power struggles with women, but that he was more compliant with men. Isaiah was first referred to Frost because Isaiah had sexually touched a child who was more than three years younger than him. Isaiah had expressed that he did not want to see his father, and that his father had instructed him not to talk about being a victim of sexual abuse.
 {¶ 21} Barbara Maloney, the HCJFS caseworker, reported on the status of each of the children at the time of the custody hearing. Maloney testified that Isaiah had recently been hospitalized and was talking about suicide. He also refused to have any contact with any family member, though in the crisis-stabilization unit at St. Joseph he saw Loucareia on a daily basis. Maloney testified that Loucareia had recently been released from her third hospitalization into a step-down unit, but that she was still not considered stable.
 {¶ 22} Maloney reported that Dominique had made major progress since being removed from Brown's home. Maloney stated that Dominique was very mature and could articulate her needs and wants, and that she had many goals for her life. Maloney stated that Malik was in a therapeutic foster home and doing well. She testified that he was adjusted to the foster home and enjoyed it tremendously, and that HCJFS did not have any concerns about him. She also reported that Malik's foster parent was willing to adopt him.
 {¶ 23} Maloney also testified about other family members who were considered as potential caretakers for the children. Maloney stated that Dawn Wilkinson's daughter, Tomeka Mitchell, was not appropriate for placement because she had no income and "has very new sobriety and appeared to be struggling herself." Sabrina Williams, Louis Wilkinson's sister, was deemed inappropriate due to her extensive criminal history, a history with HCJFS in a recently closed case, and a history of substance abuse. Isaiah and Malik were placed at one time with a relative, Mildred Brown, but she had asked to have them removed from her home, stating that she never intended to raise the children on a full-time basis.
 {¶ 24} Finally, Maloney testified that she did not think that Brown could be an appropriate caretaker for the children. She stated, "I don't believe that Ms. Brown fully understands what sexual abuse is. I think that she becomes focused on her other issues. And I don't think that she could provide the care needed for these children."
 {¶ 25} All parties submitted closing arguments to the magistrate in writing. The guardian ad litem for the children noted in her report that the children had not lived with Brown since April 2001, a period of over two years at the time of the report. The guardian advocated a permanent commitment to HCJFS to secure permanent, safe, and structured homes for the children and stated that permanent commitment would be in the best interest of the children.
 {¶ 26} The magistrate adjudicated Isaiah, Dominique, Loucareia, and Malik dependent. The magistrate also adjudicated Dominique and Loucareia abused. The magistrate then found that the children could not be placed with either parent within a reasonable time and should not be placed with either parent. The magistrate then determined that it was in the best interest of the children to be committed to the permanent custody of HCJFS.
 {¶ 27} Brown, Louis Wilkinson, and Dawn Wilkinson all filed objections. The juvenile court then accepted and approved the decision of the magistrate, affirming the award of permanent custody to HCJFS.
 {¶ 28} In this appeal, Dawn Wilkinson asserts one assignment of error, arguing that the trial court erred when it found that it was in the best interest of the children to be committed to the permanent custody of HCJFS. Louis Wilkinson argues that there was insufficient evidence to support an award of permanent custody to HCJFS, and that the trial court erred when it found that the children were dependent and abused, and when it denied Brown's petition for custody. Brown claims that the trial court erred when it found that the children were dependent, and that Loucareia and Dominique were abused, and that it erred in finding that it was in the children's best interest to award permanent custody to HCJFS. Since the arguments are interrelated and overlap, we consider them collectively.
 Abused and Dependent {¶ 29} An "abused" child includes any child who is "the victim of `sexual activity' as defined under Chapter 2907 of the Revised Code, where such activity would constitute an offense under that chapter, except that the court need not find that any person has been convicted of the offense in order to find that the child is an abused child."[1] A "dependent" child is one who "lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian" or whose "condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship."[2]
 {¶ 30} The facts supporting a finding of abuse or dependency must be proved by clear and convincing evidence.[3] Clear and convincing evidence is more than a mere preponderance of evidence; it is evidence sufficient to cause the trier of fact to develop a firm belief or conviction as to the facts sought to be established.[4] We will not reverse a trial court's determination that a child was abused or dependent unless we are convinced that it is not supported by sufficient evidence to meet the clear and convincing standard.[5]
 {¶ 31} At the custody hearing, evidence was presented concerning Loucareia's sexualized and aggressive behaviors, including fondling herself, asking other children if they wanted to pull her pants down, and attempting to urinate on others. Dominique, at the age of six, tested positive for a sexually transmitted disease. The law does not require that a specific perpetrator of sexual abuse be identified, only that there be clear and convincing evidence that a child is a victim of abuse.[6] We conclude that there was clear and convincing evidence supporting the trial court's determination that Loucareia and Dominique were abused.
 {¶ 32} Concerning dependency, evidence was presented indicating that Brown regularly and willingly left the children in the unsupervised care of Wilkinson, a known sexual offender. The older three children had severe psychological issues due to past abuse, and the parents and grandmother were unable to acknowledge or appropriately deal with the children's issues. We conclude that clear and convincing evidence supported the trial court's determination that the children's conditions and their environment warranted the state's assumption of guardianship. Therefore, the trial court did not err when it adjudicated the children dependent.
 Permanent Custody {¶ 33} A juvenile court may grant permanent custody of a child to the state if the court determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody.[7] The court must also determine, by clear and convincing evidence, that one of the following applies: (1) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (2) the child is abandoned and the parents cannot be located; (3) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (4) the child has been in the temporary custody of one or more public children services agencies or private child-placing agencies for twelve or more months of a consecutive twenty-two-month period, ending on or after March 18, 1999.[8]
 {¶ 34} In determining what is in the best interest of the child, the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child, including whether the child has been in the temporary custody of public or private children services agencies for twelve or more months; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.[9]
 {¶ 35} In addition, the court should consider the factors listed in R.C. 2151.414(E)(7) through (11), which include whether the parent has been convicted of certain offenses, has withheld medical treatment or food from the child, has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times, has abandoned the child, or has had parental rights involuntarily terminated with respect to a sibling of the child.[10]
 {¶ 36} As we have already noted, clear and convincing evidence is more than a mere preponderance of evidence; it is evidence sufficient to cause the trier of fact to develop a firm belief or conviction as to the facts sought to be established.[11] Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof.[12]
 {¶ 37} We note that several appellate courts have recently confused this standard of review, incorrectly stating in their decisions that a reviewing court in an award of permanent custody to the state must determine if the trial court abused its discretion.[13] But the trial court's determination to award permanent custody must be supported by clear and convincing evidence. It is not purely a discretionary decision. Therefore, an appellate court does not review the trial court's decision for an abuse of discretion, but instead must determine whether there was sufficient evidence to meet the clear and convincing standard.
 {¶ 38} In this case, the trial court weighed the testimony of numerous witnesses concerning whether a permanent removal from Brown's custody would be in the best interest of the children. Dr. Elliott, an expert in clinical psychology, stated that Brown lacked insight and failed to understand the risks of allowing her son, a known sexual offender, to care for the children. She testified that it was her opinion that the children would not be safe and appropriately cared for if returned to Brown's custody. Dr. Glynn, Brown's psychologist, testified that it was his opinion that Brown would be unfit to supervise or to act as a parental figure for the children. Barbara Maloney, the children's current HCJFS caseworker, testified that she did not believe that Brown understood what sexual abuse was and that Brown could not adequately care for the children. The guardian ad litem for the children advocated a permanent commitment to HCJFS.
 {¶ 39} In addition to relying on the professional opinions rendered in support of a permanent commitment to HCJFS, the trial court considered the statutory factors relevant to determining what was in the best interest of the children. The court found by clear and convincing evidence that the interaction and interrelationship of the children with their parents, siblings, relatives, foster parents, and out-of-home providers caused the children's best interest to be served by the termination of parental rights. In addition to the guardian ad litem's report recommending permanent commitment to HCJFS, the court noted that the two older children had stated that they did not want to return to their biological family. All of the children had been in and out of foster care for most of their lives, and the court indicated that the children needed a legally secure and permanent home.
 {¶ 40} We conclude that the trial court did not err when it found that there was clear and convincing evidence that awarding permanent custody to HCJFS was in the best interest of the children. Similarly, we conclude that sufficient evidence supported the court's finding that the children could not be placed with either parent within a reasonable time and that the children should not be placed with either parent.
 {¶ 41} We agree with the trial court that these children are in need of a legally secure placement, and that that type of placement cannot be achieved without a grant of permanent custody to HCJFS. Therefore, we uphold the award of permanent custody of the Wilkinson children to HCJFS and affirm the judgment of the trial court.
Judgment affirmed.
Doan, P.J., and Hildebrandt, J., concur.
[1] R.C. 2151.031(A).
[2] R.C. 2151.04(B) and (C).
[3] R.C. 2151.35(A).
[4] See Cross v. Ledford (1954), 161 Ohio St. 469,120 N.E.2d 118, paragraph three of the syllabus.
[5] See In re Leitch, 3rd Dist. No. 13-01-11, 2001-Ohio-2306.
[6] See In re Pitts (1987), 38 Ohio App.3d 1, 5,525 N.E.2d 814.
[7] R.C. 2151.414(B)(1).
[8] R.C. 2151.414(B)(1)(a) through (d).
[9] R.C. 2151.414(D).
[10] R.C. 2151.414(E)(7) through (11).
[11] See Cross v. Ledford, supra.
[12] See In re Knight (Mar. 22, 2000), 9th Dist. Nos. 98CA007258 and 98CA007266, citing State v. Schiebel (1990),55 Ohio St.3d 71, 74, 564 N.E.2d 54.
[13] For example, see In re B.R., 8th Dist. No. 83674, 2004-Ohio-3865, at ¶ 27; In re Definbaugh, 5th Dist. No. 2004 AP 02 0010, 2004-Ohio-3367, at ¶ 27; In re Ross, 11th Dist. No. 2003-G-2550, 2004-Ohio-3680, at ¶ 94; In re Strychalski, 7th Dist. No. 03-CA-797, 2004-Ohio-1542, at ¶ 47; In re P.P., 2nd Dist. No. 19582, 2003-Ohio-1051, at ¶ 14.