## In re GRAHAM et al.

[Cite as *In re Graham*, 167 Ohio App.3d 284, 2006-Ohio-3170.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–060129.

Decided June 23, 2006.

Melanie B. Walls, for appellant, Barbara Graham.

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Mark Sauers, Assistant Prosecuting Attorney, for appellee, Hamilton County Job and Family Services.

Allison McWhorter, guardian ad litem for the minor children.

MARK P. PAINTER, Judge.

{¶ 1} Appellant Barbara Graham appeals the judgment of the Hamilton County Juvenile Court granting permanent custody of Andrew Graham, Sean Graham, and Kera Graham to the Hamilton County Job and Family Services ("HCJFS"). We affirm.

## I. The Graham Children

{¶ 2} Andrew, born July 9, 1992, Sean, born September 17, 1993, and Kera, born October 24, 1996, are the children of Roger and Barbara Graham. In 2002, due to allegations of sexual abuse, the children were removed from the Grahams' home and placed in the temporary custody of HCJFS. Kera revealed to her school-bus driver that her father had been touching her and that she wanted to kill herself. Andrew told a school counselor that he wanted to die by jumping off

a balcony at school. The children were placed in separate homes due to the sexually reactive behavior among them.

{¶ 3} Each child began receiving individual therapy. In April 2003, Roger Graham died. After their father's death, the children's therapies focused on issues of grief and loss. Eventually, individual therapy refocused on each child's particular problems, and they began to participate in joint therapy with their mother in 2004.

{¶ 4} In April 2004, HCJFS moved to secure permanent custody of the children. Hearings on the permanent-custody motion took place over six months, with numerous witnesses and in-camera interviews of Andrew and Sean by the magistrate. The parties stipulated that "the children's acting out reflects a sexualized family dynamic and necessitates treatment of the entire family regarding appropriate sexual boundaries, victimization and perpetration."

{¶ 5} At the permanent-custody hearing, Dr. Stuart Bassman testified. Bassman, a psychologist and an expert in sexual abuse, headed a team of therapists that worked with the entire Graham family. Bassman himself conducted therapy with Barbara and Roger, and after Roger's death, he conducted joint sessions with Barbara and each child. Bassman emphasized that his role was to facilitate healing and to help the family deal with the allegations of sexual abuse. His role was not necessarily to uncover the truth of the allegations or to determine whether the family should be reunified.

{¶ 6} Bassman testified that each family member had experienced much anxiety and pain and that the family members had to become more stable before family therapy could be attempted. At the time of his testimony, Bassman felt that the family was at least six months to a year away from being able to begin family therapy, which would have been an "important prerequisite" to reunification.

{¶ 7} Bassman testified that Kera was "a deeply hurting and deeply confused child," with a number of symptoms of posttraumatic-stress disorder and generalized anxiety disorder. Bassman volunteered that he was concerned about her reality testing and noted that she had had recent violent outbursts. Bassman testified that Andrew was "a very aggressive, hostile youngster. * * * Andrew has a lot of rage inside. I'm very concerned about Andrew's emotional stability." Bassman observed that Sean was more neurotic than angry, and that he tended to blame himself for his and his family's problems. Bassman felt that Sean functioned the best of the children but that all three were "deeply disturbed."

{¶ 8} Bassman further testified that Barbara had been diagnosed as having a bipolar disorder and had herself been a victim of sexual abuse as a child. Bassman concluded that all family members were "in one way or another dealing

with posttraumatic stress disorder, anxiety, attachment disorder problems, things like that."

{¶ 9} Bassman testified that he felt all family members were progressing in their therapy and that the family members were bonded to each other. But Bassman acknowledged that Barbara was not ready to be discharged from therapy or to have her children at home with her.

{¶ 10} Therapists for Barbara, Andrew, Sean, and Kera all testified. The therapists each detailed the areas they were working on with each individual. Similar to Dr. Bassman, the therapists emphasized that their role was not to determine what had happened to cause the family problems but to address the emotional aspects of the allegations of sexual abuse.

{¶ 11} Andrew's therapist testified that Andrew was suffering from bipolar disorder with possible psychotic features, attention-deficit hyperactivity disorder, and oppositional defiant disorder. Andrew also had had instances of sexual acting out. Sean was diagnosed with adjustment disorder and depressed mood, though he seemed to be functioning well in his foster home. Kera was diagnosed with posttraumatic-stress disorder, sexual abuse, and attention-deficit hyperactivity disorder.

{¶ 12} At the time of the hearing, Kera exhibited a number of violent outbursts, and a case manager testified that Kera's behavior had regressed. At the same time, due to aggressive delinquent behavior, Andrew had been removed from his foster home and had been placed in the Altercrest residential facility.

{¶ 13} While the therapists felt that the family members were making progress in their therapies, all acknowledged that the family members had severe emotional problems that would take a long time to overcome, if ever. One of Kera's therapists was asked, "In comparison to other cases that you've had in your 15 years at Children's Hospital, where does this, you know, the allegations and then the impact on the child?" The therapist answered, "The top three. And I've worked with a lot of children."

{¶ 14} Barbara Graham admitted in her testimony that she was not sure that she could handle all the kids at home with her. When asked if she believed her children's repeated allegations of sexual abuse, she replied, "I think my children believe in their heart these things happened.  * * *  I think some things occurred, not with myself or my husband personally, and the children's minds, they get twisted around and confused about different eras in their life, and then they clump them all together, and then that's how it comes out." She acknowledged that a reunification of the family at that time was not in the best interests of the children.

{¶ 15} In June 2005, the magistrate denied HCJFS's motion for permanent custody. The magistrate committed Andrew to a planned permanent-living arrangement ("PPLA") with HCJFS. The magistrate then placed Sean and Kera, who had not lived together for three years, in the legal custody of Sean's foster parents, Lynette and Robert Scantlin.

{¶ 16} Both HCJFS and the children's guardian ad litem ("GAL") objected to the magistrate's decision. The trial court then rejected the magistrate's decision and committed Andrew, Sean, and Kera to the permanent custody of HCJFS. Graham now presents four assignments of error on appeal.

## II. Permanent Custody

{¶ 17} In her first and second assignments of error, Graham argues that there was insufficient evidence to support an award of permanent custody to HCJFS and that the trial court should have granted a less restrictive placement.

{¶ 18} A juvenile court may grant permanent custody of a child to the state if the court determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody.[1] The court must also determine, by clear and convincing evidence, that one of the following applies: (1) the child is not abandoned or orphaned and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents, (2) the child is abandoned and the parents cannot be located, (3) the child is orphaned and there are no relatives of the child who are able to take permanent custody, or (4) the child has been in the temporary custody of one or more public children services agencies or private child-placing agencies for 12 or more months of a consecutive 22–month period ending on or after March 18, 1999.[2]

{¶ 19} In determining what is in the best interest of the child, the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child, (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, (3) the custodial history of the child, including whether the child has been in the temporary custody of public or private children services agencies for 12 or more months, and (4) the child's

---

1. R.C. 2151.414(B)(1).

2. R.C. 2151.414(B)(1)(a) through (d).

need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.[3]

{¶ 20} In addition, the court should consider the factors listed in R.C. 2151.414(E)(7) through (11), which include whether the parent has been convicted of certain offenses, has withheld medical treatment or food from the child, has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times, has abandoned the child, or has had parental rights involuntarily terminated with respect to a sibling of the child.[4]

{¶ 21} Clear and convincing evidence is more than a mere preponderance of evidence; it is evidence sufficient to cause the trier of fact to develop a firm belief or conviction as to the facts sought to be established.[5] Where the proof required must be clear and convincing, a reviewing court must examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof.[6]

{¶ 22} In this case, the trial court weighed the testimony of numerous witnesses concerning whether permanent removal of the children from Graham's custody would be in the children's best interest. According to the many therapists working with the family, Andrew, Sean, and Kera all had severe emotional issues that would require therapy for some time. Dr. Bassman testified that Graham continued to struggle with her own sexual victimization, which impaired her ability to deal with her children's issues. And Keshawn Brown, a former HCJFS case manager for the Grahams, testified that although Graham was cooperative in participating in services, she had not shown a significant amount of progress in her ability to maintain a healthy and safe relationship with her children.

{¶ 23} The GAL for the children advocated a permanent commitment to HCJFS. The GAL noted that Graham lacked insight into the sexual abuse that had occurred in her home and that Graham had never acknowledged that the abuse had actually happened.

---

3. R.C. 2151.414(D).

4. R.C. 2151.414(E)(7) through (11).

5. See *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus.

6. See *In re Wilkinson*, 1st Dist. Nos. C–040182, C–040203, and C–040282, 2004-Ohio-4107, 2004 WL 1752821, at ¶ 36–37; see, also, *In re Knight* (Mar. 22, 2000), 9th Dist. Nos. 98CA007258 and 98CA007266, 2000 WL 296091, citing *State v. Schiebel* (1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54.

{¶ 24} In addition to relying on the professional opinions rendered in support of a permanent commitment to HCJFS, the trial court considered the relevant statutory factors. The court found by clear and convincing evidence that the children's behaviors prevented them from being able to live with each other. The court also noted that the children's brother Nicholas, who was not part of this case, had been in HCJFS's custody since 2001. Treatment teams for Nicholas concluded that he had endured long-term, chronic sexual abuse. The court noted that Nicholas had "been unable for four years to step down from residential/medical/educational placements."

{¶ 25} The court further found that the Graham children were in need of safe, secure, and permanent homes. The trial court expressed concern that anything less than permanent custody to HCJFS could allow Graham to "impede and possibly manipulate the stability of the children's placements through residual rights association and available future court actions."

{¶ 26} We conclude that the trial court did not err when it found that there was clear and convincing evidence that awarding permanent custody to HCJFS was in the best interests of the children. Similarly, we conclude that sufficient evidence supported the court's finding that the children could not be placed with their mother within a reasonable time and that the children should not be placed with their mother.

{¶ 27} Graham further argues that the trial court erred by granting permanent custody to HCJFS when a less restrictive alternative was available. Graham contends that the magistrate's award of legal custody of Sean and Kera to Sean's foster parents and placement of Andrew in a PPLA was in the children's best interests.

{¶ 28} But after reviewing the record, the trial court rejected the magistrate's decision regarding the children. The trial court concluded that the children were still young enough to rebound if they were given safe, secure, stable, and permanent homes. The court found that further uncertainty, through association with Graham and more litigation, would likely prevent the possibility of improvement and instead harm the children even more. The court also noted that the permanency needs of the children outweighed the parental rights and participation desires of Graham.

{¶ 29} We conclude that the trial court had sufficient evidence to support its determination that mere legal custody to HCJFS was not in the best interests of the children. We agree with the trial court that the children were in need of a legally secure placement and that that type of placement could not be achieved without a grant of permanent custody to HCJFS. Therefore, we overrule Graham's first and second assignments of error.

### III. Appointed Counsel

{¶ 30} In her third assignment of error, Graham argues that the trial court erred when it did not appoint independent counsel for the children or hold a hearing to investigate the need for independent counsel.

{¶ 31} In *In re Williams*, the Ohio Supreme Court held that a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and is entitled to independent counsel in certain circumstances.[7] The court then stated, "[C]ourts should make a determination, on a case-by-case basis, whether the child actually needs independent counsel, taking into account the maturity of the child and the possibility of the child's guardian ad litem being appointed to represent the child."[8]

{¶ 32} In *In re Walling*, we held that those "certain circumstances" for independent counsel are instances where a child's wishes are in conflict with the child's GAL's recommendation and the GAL is serving as the child's attorney.[9] We further held that if this occurs, a court should conduct an in camera, recorded interview with the child to determine whether independent counsel is needed.[10]

{¶ 33} In this case, the record does contain examples of the children expressing a desire to see their mother. But the record also reveals that the children felt conflicted about returning home.

{¶ 34} The GAL for the children reported to the court before the permanent-custody hearing that all the children had on occasion communicated their desire to go home with their mother. But the GAL also reported that Sean had indicated that he would be fine if he just visited with his mother and that Andrew had expressed conflicting feelings about returning home. The GAL also gave her opinion that Kera was not mature enough to be able to determine what was in her best interest.

{¶ 35} Based on the GAL's report that the children sometimes expressed a wish to be with their mother and the fact that the GAL was recommending against reunification, the magistrate considered whether independent counsel should be appointed for the children for the permanent-custody hearing. The magistrate decided against it, concluding that the children had not consistently expressed a desire to return home.

---

7. *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110, syllabus.

8. Id. at ¶ 17.

9. *In re Walling*, 1st Dist. No. C–050646, 2006-Ohio-810, 2006 WL 445981, at ¶ 24.

10. Id.

{¶ 36} During the permanent-custody hearing, the magistrate held in camera meetings with Andrew and Sean. The magistrate's findings from those meetings are unclear. Both boys mentioned an interest in being placed with relatives if their first choices was not possible. Also, Andrew stated that he preferred a group placement to his current foster home, while Sean stated that he was comfortable with his foster family.

{¶ 37} Graham argues that the facts of this case are analogous to those of *In re Williams*. But in *Williams*, the child had repeatedly expressed a desire to remain with his parent.[11] Here, the children sometimes stated they wanted to be with their mother but also expressed conflicting emotions about where they wanted to be placed.

{¶ 38} We conclude that the magistrate sufficiently investigated the need for independent counsel to represent the children's wishes. We further conclude that the children were not consistent in expressing a desire to live with their mother and that it was not necessary to appoint independent counsel for them.

{¶ 39} Therefore, the magistrate did not err in failing to appoint independent counsel for the children, and Graham's third assignment of error is overruled.

### IV. Ineffective Assistance of Counsel

{¶ 40} In her fourth assignment of error, Graham argues that she received ineffective assistance of counsel. Graham contends that she was prejudiced by her counsel's failure to request separate counsel for the children and to cross-examine the GAL on the contents of her report recommending permanent custody to HCJFS.

{¶ 41} To establish ineffective assistance of counsel, Graham must demonstrate that her counsel's performance fell below an objective standard of reasonable competence and that there was a reasonable probability that, but for that deficiency, the outcome of the hearing would have been different.[12] Judicial scrutiny of counsel's performance must be highly deferential.[13] A court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.[14]

---

11. *In re Williams*, supra, at ¶ 5.

12. See *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus.

13. See *Strickland v. Washington*, supra, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley*, supra, at 142, 538 N.E.2d 373.

14. Id.

{¶ 42} We have already determined that independent counsel for the children was not warranted, so Graham's case was not prejudiced by her counsel's failure to request separate counsel for the children. As for not cross-examining the GAL, the voluminous record reflects Graham's counsel's zealous and thorough representation of Graham's interests throughout the hearing. We conclude that the outcome of the hearing would not have been different with any additional cross-examination of the GAL. Therefore, Graham's argument lacks merit, and we overrule her fourth assignment of error.

{¶ 43} Having overruled all of Graham's assignments of error, we affirm the trial court's judgment.

Judgment affirmed.

HILDEBRANDT, P.J., and GORMAN, J., concur.