DECISION.
{¶ 1} Alonzo Kennedy was born January 19, 2004. He resided at 4447 Eastern Avenue in Cincinnati with his mother, appellant Deanna Llewellyn, his father, Paul Kennedy, his maternal grandmother, and his grandmother's live-in paramour, Willie Hunter. When Alonzo was five days old, an anonymous call was placed to 241-KIDS alleging medical neglect and the presence of a sex offender in the home. When police and emergency personnel responded to the home, Alonzo appeared to be healthy.
 {¶ 2} Zachary Vargo, a sexual-abuse investigator for Hamilton County Jobs and Family Services ("HCJFS"), unsuccessfully attempted on several occasions in January and February to make contact with the child to assess any risks. On February 19, 2004, Vargo spoke on the telephone with Llewellyn, who agreed to meet with Vargo at the Eastern Avenue residence on February 23, 2004. When Vargo arrived for the scheduled visit, Llewellyn's mother told Vargo that Llewellyn had moved to Kentucky.
 {¶ 3} On March 26, 2004, HCJFS filed a complaint for temporary custody, alleging that Alonzo was neglected, abused, and dependent. In April 2004, Kennedy was adjudicated to be Alonzo's father. HCJFS was granted interim custody, and Alonzo was placed with a great-aunt in Kentucky. On March 14, 2005, the complaint was amended to request permanent custody because of the lack of progress toward case-plan goals by Alonzo's parents and their refusal to comply with some of the case-plan provisions. After a hearing on March 17, 2005, the magistrate adjudicated Alonzo abused and dependent, and dismissed the neglect allegation.
 {¶ 4} The evidence showed that Kennedy had a criminal history of abusing young girls. Kennedy had been convicted of corruption of a minor for engaging in a sexual relationship with an 11-year-old girl. When Kennedy was released from prison for that crime, he lived with Llewellyn and her mother. Kennedy, who was 20 years old at the time, committed gross sexual imposition against Llewellyn, who was then nine years old. Llewellyn had been in HCJFS custody through May of 2002 because she had been physically abused by Willie Hunter. All five family members had been listed as residents of the Eastern Avenue address in February 2004 and March 2005 by someone seeking public assistance.
 {¶ 5} The trial court upheld the magistrate's decision adjudicating Alonzo abused and dependent. The court noted that Llewellyn had denied that Kennedy had committed any offense against her, that she had not cooperated with HCJFS's investigation, and that she had violated a duty of care to Alonzo because she had created a risk to his health and safety by placing him in a home with a known sex offender.
 {¶ 6} A dispositional hearing was held on January 12 and March 21, 2006. The magistrate awarded permanent custody to HCJFS. The trial court adopted the magistrate's decision. Llewellyn has appealed. Her original appellate counsel filed an Anders brief. But we appointed new appellate counsel, who has raised two assignments of error for our review.
 {¶ 7} Llewellyn's first assignment of error alleges that the Hamilton County Juvenile Court lacked subject-matter jurisdiction because Llewellyn and Alonzo were residing in Kentucky at the time the complaint was filed.
 {¶ 8} When the complaint was filed on March 26, 2004, former R.C.3109.22(A)(1) through (4) applied to an Ohio court's assumption of jurisdiction to decide custody in the first instance.[1] Applicable to this case are former R.C. 3109.22(A)(1) and (2), which provided, "No court of this state that has jurisdiction to make a parenting determination relative to a child shall exercise that jurisdiction unless one of the following applies: (1) This state is the home state of the child at the time of commencement of the proceeding, or this state had been the child's home state within six months before the commencement of the proceeding and the child is absent from this state because of his removal or retention by a parent who claims to be the residential parent and legal custodian of a child or by any other person claiming his custody or is absent from this state for other reasons, and a parent or person acting as a parent continues to live in this state; (2) It is in the best interests of the child that a court of this state assumes jurisdiction because the child and his parents, or the child and at least one contestant, have a significant connection with this state, and there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships[.]"
 {¶ 9} Under former R.C. 3109.21(E), the "home state" of a child less than six months old was the state in which the child lived from birth with his parents, a parent, or a person acting as a parent. Former R.C.3109.22(C) provided, "Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to make a parenting determination relative to the child."
 {¶ 10} At the hearing before the magistrate on October 12, 2004, Llewellyn testified that, in January of 2004, she and Alonzo lived at the Eastern Avenue address with Kennedy, her mother, and Hunter. Llewellyn denied making an appointment to meet Vargo. Llewellyn testified that she had moved to Williamsburg, Kentucky, in February of 2004, but she was unable to remember her address. Llewellyn testified, and postal records confirmed, that on March 27, 2004, in Williamsburg, Kentucky, she had signed for a certified letter sent by Vargo. Vargo had mailed the certified letter to the Eastern Avenue address. Someone had scratched out that address and written in an address in Williamsburg, Kentucky.
 {¶ 11} Vargo testified that after 241-KIDS had received the initial telephone call about a sex offender living in the house, he attempted on January 26, February 2, and February 9, 2004, to make contact with Alonzo at the Eastern Avenue address to assess any risk to the child. On February 19, 2004, Vargo received a telephone call from Llewellyn, during which she confirmed that her address was 4447 Eastern Avenue. Vargo made an appointment to meet Llewellyn at the Eastern Avenue residence on February 23, 2004. When Vargo arrived on February 23 for the meeting, Llewellyn's mother told Vargo that Llewellyn had moved to Kentucky. Llewellyn's mother would not provide any contact information. On February 25, 2004, Vargo received a letter from Llewellyn stating that she lived in Kentucky, but no contact information was provided. Vargo presented HCJFS household-verification records for January 26, 2004, and March 17, 2005, which indicated that someone had applied for public assistance listing Llewellyn, Alonzo, Kennedy, Llewellyn's mother, and Hunter as residents of 4447 Eastern Avenue. Vargo testified that he had used the household-verification forms to determine who was living at the Eastern Avenue address on February 26, 2004. When questioned about applying for public assistance, Llewellyn stated that the packet of forms had been sent to her at the Eastern Avenue residence, but that she had never applied for public assistance.
 {¶ 12} At the March 17, 2005, hearing, the magistrate reviewed certain stipulations with Llewellyn and Kennedy. The magistrate asked Llewellyn and Kennedy whether they stipulated that they had lived at 4447 Eastern Avenue with Alonzo, his maternal grandmother, and Hunter. Llewellyn's guardian ad litem stated, "That's at the time of the filing of the complaint you all lived there, not now, that was way back when." The magistrate asked, "Is that true Mr. Kennedy?" Kennedy answered, "Yes." Llewellyn's counsel said, "No, on the 24th of the last year, January." Llewellyn stated, "Yes."
 {¶ 13} We note that, throughout the proceedings, Llewellyn was less than clear about her residency. During her psychological evaluation on July 22, 2004, Llewellyn stated that she had lived at 4447 Eastern Avenue for approximately two months, and prior to that she had lived for a year and a half in Ft. Thomas, Kentucky. At the dispositional hearing on January 12, 2006, Llewellyn testified that she and Kennedy had moved in with her mother and Hunter on May 16, 2003, and lived there for about a year and a half, which would have included the time of Alonzo's birth and the filing of the complaint.
 {¶ 14} We hold that the record contains sufficient evidence from which the trial court could have determined that Ohio was Alonzo's home state under former R.C. 3109.22(A)(1). The evidence concerning Llewellyn's purported move to Kentucky was conflicting. We hold that there was sufficient evidence upon which the trial court could have concluded that when the complaint was filed, Alonzo had been living in Ohio with a parent or a person acting as a parent.
 {¶ 15} Assuming, for the purposes of argument, that Llewellyn had moved to Kentucky with Alonzo in February of 2004, jurisdiction would still have been proper in Ohio under former R.C. 3109.22(A)(1), because Ohio had been Alonzo's home state within six months of the commencement of the proceedings, Alonzo was absent from the state, and a parent or person acting as a parent, in the person of Kennedy, continued to live in Ohio. Kennedy was Alonzo's natural father, Alonzo carried Kennedy's name, and Kennedy had been living as Alonzo's father in a family relationship. There is no allegation or evidence that Kennedy's residence was in any state other than Ohio.
 {¶ 16} Jurisdiction was also proper in Ohio under former R.C.3109.22(A)(2). Alonzo and his parents had significant connections to Ohio. Alonzo had lived in Ohio with his family, including his father, his maternal grandmother, and Hunter, all of whom still lived in Ohio. Clearly those people figured prominently in Alonzo's future care, protection, and personal relationships. The evidence concerning the background of the family, including the history of sexual and physical abuse, was available in Ohio. The record supports a determination that Ohio was the state with the most significant connections to Alonzo, and that it was in Alonzo's best interests for Ohio to exercise jurisdiction over the case. The first assignment of error is overruled.
 {¶ 17} Llewellyn's second assignment of error alleges that the trial court erred in granting permanent custody of Alonzo to HCJFS, because the evidence did not support the termination of Llewellyn's parental rights and because a relative was able and willing to take legal custody.
 {¶ 18} To grant permanent custody to the state, the juvenile court must determine by clear and convincing evidence that it is in the child's best interests to grant permanent custody.[2] The court must also determine that one of the following applies: (1) the child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child-placing agencies for 12 or more months of a consecutive 22-month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (2) the child is abandoned; (3) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (4) the child has been in the temporary custody of one or more public children services agencies or private child-placing agencies for 12 or more months of a consecutive 22-month period, ending on or after March 18, 1999.[3]
 {¶ 19} In determining what is in the best interests of the child, the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child, including whether the child has been in the temporary custody of public or private children services agencies for 12 or more months; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.[4]
 {¶ 20} In addition, the court should consider whether the parent has been convicted of certain criminal offenses including sex offenses, has withheld medical treatment or food from the child, has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times, has abandoned the child, or has had parental rights involuntarily terminated with respect to a sibling of the child.[5]
 {¶ 21} Clear and convincing evidence is evidence sufficient to cause the trier of fact to develop a firm belief or conviction as to the facts sought to be established.[6] "Where the proof required must be clear and convincing, a reviewing court must examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof."[7]
 {¶ 22} The magistrate noted that Llewellyn had had Alonzo living in a home with Kennedy, who had sexually abused Llewellyn when she was a child, and with Hunter, who had physically abused her. Kennedy had refused to engage in sexual-offender treatment. He had attempted suicide 19 times. Llewellyn did not see this as a problem, stating that she would take Alonzo out of the room if Kennedy attempted suicide. The magistrate stated that Llewellyn was unable to recognize the risks to Alonzo from Kennedy, a suicidal sex offender, and from Hunter, a man who had physically abused her. The magistrate stated that Alonzo's parents appeared to accept physical and sexual abuse as a way of life. The trial court adopted the magistrate's decision, stating that Alonzo's parents "do not recognize how their behavior will affect their child and they have failed to address the issues of concern."
 {¶ 23} The record shows that Llewellyn had complied with some of the case-plan goals. She had completed parenting classes and gotten her own apartment. But it is clear from the record that Llewellyn had refused to separate herself from Kennedy. Kennedy was present in Llewellyn's home daily, and he "occasionally" stayed overnight. Llewellyn referred to Kennedy as "a great guy." She continued to deny that he had committed any offense against her. It is also clear that Llewellyn had no real understanding about how the abusers in her life could have been a threat to her child or about how to protect her child. Llewellyn argues that, given time and therapy, she could have learned how to deal with these issues while foster care for her child continued. But Llewellyn refused to engage in therapy designed for that very purpose. Llewellyn testified that she did not think that Alonzo was at risk due to her failure to engage in therapy designed to help her recognize and avoid physical and sexual abusers. She testified that she would recognize a sexual predator because "they'll give me a bad vibe and give me chills." She stated that Kennedy did not give her a "bad vibe."
 {¶ 24} Beth Reganelli of HCJFS testified that the agency was seeking permanent custody to pursue adoption by the relative who had been providing Alonzo with foster care. Reganelli stated that Alonzo had "done well" in the foster home, that he was "attached to the family," that his care in the foster home had been "extremely appropriate," and that the foster mother wanted to provide Llewellyn with "some contact" with Alonzo.
 {¶ 25} We hold that the trial court had sufficient evidence to support its decision to award HCJFS permanent custody of Alonzo. The record fully supports the trial court's belief that Llewellyn would not have kept the abusers from her child and that this would not have changed over time. We agree with the trial court that Alonzo was in need of a legally secure placement, and that that type of placement could not have been achieved without a grant of permanent custody to HCJFS. The second assignment of error is overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
SUNDERMANN, P.J., and HENDON, J., concur.
RALPH WINKLER, retired, from the First Appellate District, sitting by assignment.
[1] R.C. 3127.53; see State ex rel. Aycock v. Mowrey (1989),45 Ohio St.3d 347, 544 N.E.2d 657; Snowberger v. Wesley, 9th Dist. No. 22431,2005-Ohio-3628.
[2] R.C. 2151.414(B)(1).
[3] R.C. 2151.414(B)(1)(a) through (d).
[4] R.C. 2151.414(D).
[5] R.C. 2151.414(E)(7) through (11).
[6] See Cross v. Ledford (1954), 161 Ohio St. 469,120 N.E.2d 118.
[7] See In re Graham, 167 Ohio App.3d 284, 2006-Ohio-3170,854 N.E.2d 1126.