[Cite as *In re W.W.*, 2011-Ohio-4912.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: W.W. | : | APPEAL NOS. C-110363 |
| | | C-110402 |
| | : | TRIAL NO. F08-1778 |
| | : | |
| | | *O P I N I O N.* |
| | : | |
| | : | |

Civil Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  September 28, 2011

*Bernadette Longano*, for Appellant Kenneth Winkle,

*Ginger S. Bock*, for Appellant Diana Winkle,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Kellie S. Bley*, Assistant Prosecuting Attorney, for Appellee Hamilton County Job and Family Services,

*Marianna Ford*, Guardian ad Litem for W.W.,

*Jonathan Schiff*, Guardian ad Litem for Diana Winkle.

Note: We have removed this case from the accelerated calendar.

Per Curiam.

{¶1}    In these consolidated appeals, appellants Kenneth and Diana Winkle challenge the judgment of the Hamilton County Juvenile Court adopting a magistrate's decision to grant permanent custody of their only child, W.W., to Hamilton County Job and Family Services ("HCJFS" or "the Agency.")

{¶2}    The parents raise several assignments of error, contending that the trial court erred by failing to appoint independent counsel for W.W. and by admitting into evidence their recorded telephone messages to various HCJFS employees and service providers, and that the court's award of permanent custody was not supported by the evidence.  Because we find that the award of permanent custody was supported by the record, and that the trial court did not err by declining to appoint independent counsel for W.W. or by admitting the challenged recordings, we affirm.

### I. Procedural History and Facts

{¶3}    Kenneth and Diana Winkle are the parents of W.W., who was born in 2000.  HCJFS became involved with the family in 2007, in part because W.W. was not attending school regularly.   An investigation raised new concerns; Diana reported a history of domestic violence between Kenneth and her that occurred in front of W.W., and Diana and W.W. exhibited mental-health issues.  Diana had been diagnosed as having a bipolar disorder, and she had a history of obsessive-compulsive behavior.  Further, Diana had sustained a traumatic brain injury ("TBI") when she was two years old and was receiving MRDD[1] services as a result of a diagnosis of borderline mental retardation.

{¶4}    Diana continued to report occurrences of domestic violence by Kenneth, including that he had placed a knife at her throat and had threatened to harm her and

---

[1] "MRDD" is an acronym for the Hamilton County Board of Mental Retardation and Developmental Disabilities.  The agency's name has been changed to the Hamilton County Board of Developmental Disabilities Services.

W.W. The police responded during one altercation over a dead goldfish. Kenneth stood outside in his underwear and refused to let go of the razor that he held in his hand. He finally dropped it after receiving multiple warnings from an officer that he would use his Taser on Kenneth.

{¶5} The state filed criminal charges against Kenneth on several occasions as the result of Diana's allegations. But Diana generally failed to follow through on her complaints. As a result of the goldfish incident, the state charged Kenneth with domestic violence and resisting arrest, and Kenneth pleaded guilty to a reduced charge of disorderly conduct.

{¶6} HCJFS and MRDD attempted to assist Diana to create a safe home environment for W.W. by offering placement in a domestic-violence shelter, domestic-violence counseling, and support in obtaining civil protection orders. Diana and Kenneth failed to demonstrate a pattern of compliance to remedy the chaotic home environment and the issue of domestic violence. Diana continued to allow Kenneth to live in the family home. Further, the parents established a pattern of refusing to send W.W. to school due to an unwarranted fear for his safety, and they exhibited inappropriate parenting practices such as neglecting W.W.'s nutritional requirements and his hygiene. For example, W.W.'s parents never took him to a dentist and they mainly served him "junk food" because he did not like nutritious food.

{¶7} In July 2008, HCJFS filed a complaint alleging that W.W. was dependent and neglected, and simultaneously moved for an interim order of temporary custody. A juvenile court magistrate granted the motion after a hearing. In her entry, the magistrate found, as required by R.C. 2151.419, that HCJFS had made "reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home."

3

{¶8} The magistrate authorized W.W.'s removal from the home and his placement in foster care, where he has remained during the entirety of the proceedings. In addition, the magistrate provided the parents with supervised visitation and appointed a guardian ad litem ("GAL") for W.W.

{¶9} The court continued the interim custody a week later after another hearing. The Agency filed a case plan to remedy the various concerns that led to W.W.'s removal, including the domestic violence and issues related to Diana's TBI, which the Agency identified as her mental illness, her compulsions, and her inappropriate parenting practices.

{¶10} Despite Kenneth's adequate employment at the time, the family had failed to pay rent for 18 months, and they were served with an eviction notice. Diana was criminally charged after she made a false allegation of rape in an effort to keep the residence. Diana and Kenneth then vacated the residence and moved to a residence in Clinton County owned by a friend. Clinton County Job and Family Services provided courtesy case-management services to the Winkles, but the agency eventually terminated its involvement after about eight months due to nonparticipation by Kenneth and Diana.

{¶11} After appointing a GAL for Diana, the magistrate conducted bifurcated adjudication and dispositional hearings. Diana declined to attend the adjudication hearing due to her anxiety. Ultimately, the magistrate recommended adjudicating W.W. dependent and neglected and awarding temporary custody to HCJFS, as provided in R.C. 2151.353(A)(2). The magistrate again found, based on the evidence presented at the hearing, that HCJFS had made "reasonable efforts."

{¶12} The magistrate adopted a reunification plan. Reunification services for the parents focused on their mental-health issues, domestic-violence issues, and parenting issues. Specifically, the court ordered case management, therapy, psychiatric services and

medication to address Diana's cognitive impairments and mental/behavioral instability; interactive parenting education for both parents as arranged by HCJFS; Kenneth's completion of the AMENDS program that he had already been ordered to complete; domestic-violence counseling for Diana; and supervised visitation.

{¶13} In addition, with respect to Kenneth, who had been diagnosed with a narcissistic personality disorder after initially refusing a mental-health assessment, the court ordered HCJFS to create a plan to address his mental health because his evaluator had concluded that he was not a good candidate for therapy. Eventually the parties agreed, and the magistrate approved, that Kenneth would attend individual therapy with Diana's psychotherapist.

{¶14} Kenneth filed an objection to the magistrate's decision awarding temporary custody on the ground that he and Diana had remedied the issues that brought W.W. into the Agency's care. The trial court overruled the objection, approved the magistrate's decision adjudicating W.W. neglected and dependent, and placed W.W. in the temporary custody of the Agency. No appeal was filed.

{¶15} HCJFS twice moved to have temporary custody extended while it pursued the goal of family reunification. The juvenile court granted both requests. The court again found that the Agency had made reasonable efforts at reunification.

{¶16} During this time, W.W. had been enrolled in individual therapy and had been doing well in the foster home. The parents participated in supervised visitations but were repeatedly corrected for treating W.W. in an age-inappropriate manner. The parents engaged in some services, but they continued to resist case-planning services and to make allegations to government organizations about HCJFS and the service providers. They accused Jermil Tarver, the HCJFS caseworker assigned to the family in December 2007, of abusing W.W. Despite the Agency's reasonable efforts, these circumstances and the

parents' move from Hamilton County to Clinton County complicated the provision of services.

{¶17} In the entry extending temporary custody for the second time, the magistrate noted that there had been substantial progress towards reunification as follows: Kenneth had begun the final phase of the AMENDS program and had arranged for individual therapy at Professional Psychiatric Services; Diana had continued to comply with recommended psychiatric medication, services, and therapy, and she had attended domestic-violence counseling; Kenneth and Diana were to begin parenting classes and couple's therapy to address past issues of violence; and supervised visitation had gone well.

{¶18} But soon after the magistrate noted this substantial progress, Diana stopped taking her medication and ended her participation in all services. Her emotional and behavioral status declined significantly, as evidenced by the increase in communications she had with HCJFS, service providers, and attorneys that were marked by threats, paranoid beliefs, and delusional thinking.

{¶19} Kenneth participated in the communications by making his own comments and by prompting and supporting Diana. He failed to attend individual mental-health therapy. Additionally, although Diana completed a four-hour on-line parenting class, neither Kenneth nor Diana completed the interactive parenting classes, and the parents did not attend couple's therapy.

{¶20} Also, in the spring of 2010, W.W. made allegations of sexual abuse against his father to his therapist. This prompted HCJFS to suspend Kenneth's visits while the allegations were investigated and eventually unsubstantiated. Family therapy was delayed in part due to these allegations.

{¶21} In June 2010, HCJFS moved to modify temporary custody to permanent custody, thereby allowing the agency to place the child for adoption. The magistrate arranged for independent mental-health evaluations for both parents to assist in their defense. Diana declined to attend her initial evaluation but eventually attended an evaluation by Dr. Buban while the custody trial was in progress.

{¶22} W.W.'s GAL recommended that the juvenile court grant HCJFS permanent custody. In accordance with *In re Williams*,[2] the magistrate conducted an in camera interview of W.W. to explore W.W.'s wishes or desires. The magistrate determined that W.W.'s wishes did not conflict with those of his GAL because W.W. had not consistently expressed a desire to return home. As a result, the magistrate declined to appoint independent counsel for W.W.

{¶23} Beginning on November 1, 2010, the magistrate held a six-day hearing on HCJFS's motion for permanent custody. Multiple witnesses testified in support of HCJFS's motion, including Tarver, the family's ongoing HCJFS caseworker; Amy Muddiman, W.W.'s treatment coordinator at Altercrest who discussed his progress; Karen Black, the visitation facilitator at the Family Nurturing Center who supervised some of the Winkles' family visits; Kathleen Ann Murphy, an assessment specialist who diagnosed Kenneth as having a narcissist personality; W.W.'s foster father, who expressed the foster family's wish to adopt W.W.; Denise Gray, who attempted to provide domestic-violence and parenting classes to Diana through the Alternatives to Violence Center; and Shelly Weaton from Clinton County Job and Family Services, who terminated that agency's courtesy case-management services due to the parents' nonparticipation.

---

[2] 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110.

{¶24} Substantial exhibits were admitted. These included over six hours of recorded telephone messages from Diana and Kenneth to various service providers and HCJFS employees.

{¶25} Dr. Aziz and Dr. Scudder, Diana's treating psychiatrists did not testify. But their medical records were admitted into evidence. These records included a letter written by Dr. Aziz to the court in June 2009, stating that because of Diana's response to treatment and her compliance with therapy and medication recommendations, he believed she could manage her mental illness and that it would not limit her ability to parent W.W. But in an October 2010 letter, Dr. Aziz informed the court that Diana had terminated the therapy and medication provided by his office.

{¶26} Both Diana and Kenneth testified. Diana stated that she had self-terminated the psychotherapy and the medication Dr. Aziz had prescribed to manage her mental illness because she "felt [she] didn't need them." Also, she admitted that she was not under the care of any mental-health professional. Kenneth characterized Diana's "rant and tirades" to so many of the individuals involved in the case as "therapeutic." He testified that he complied with her requests to join her in the inappropriate behavior to avoid a confrontation with her. With respect to his own mental health, he contested his diagnosis and did not pursue psychotherapy.

{¶27} Kenneth's independent medical examiner, Dr. Walters, testified that Kenneth did not suffer from a narcissistic personality disorder and that Kenneth could parent W.W. Dr. Walters also testified, however, that he had considered limited collateral information in arriving at his conclusions. For example, he was unaware of the telephone messages Kenneth had participated in making. Dr. Walters also recommended psychotherapy for Kenneth.

{¶28}   After hearing all the evidence and considering the recommendation of W.W.'s GAL in favor of granting the motion for permanent custody, the magistrate found that W.W., who had been the in temporary custody of HCJFS for well over 12 continuous months, could not be placed with either of his parents within a reasonable time or should not be place with either of his parents.  The court based this conclusion on findings made under the criteria set forth in R.C. 2151.414(E)(1) and (2).  Specifically, the magistrate found that (1) both parents failed continuously and repeatedly to remedy the conditions that caused W.W. to be placed outside the home despite reasonable case planning and diligent efforts to assist the parents and (2) Diana's mental illness prevented her from providing an appropriate home environment for W.W. at that time and within the next year.

{¶29}   The magistrate further determined that it was in the best interest of W.W. to terminate Kenneth's and Diana's parental rights and to award permanent custody to HCJFS.  The magistrate incorporated into her factual findings the factual findings set forth in the October 2008 entry adjudicating W.W. neglected and dependent and the January 2009 entry granting temporary custody to HCJFS.

{¶30}   Both Kenneth and Diana filed general objections to the magistrate's decision, arguing that the decision was not supported by sufficient evidence.  Neither party objected to the magistrate's specific factual determinations.  The trial court overruled the objections and adopted the magistrate's decision granting permanent custody of W.W. to HCJFS.

{¶31}   Kenneth and Diana filed separate notices of appeal, and they raise separate assignments of error challenging the judgment granting permanent custody of W.W. to HCJFS.  Diana's GAL filed a brief advocating for the reversal of the juvenile court's decision, but her GAL did not file a notice of appeal from the trial court's decision. As a

result, we consider the brief of Diana's GAL as an amicus brief. W.W.'s GAL has filed a brief advocating that this court affirm the trial court's decision, a position also held by HCJFS.

## II. Independent Counsel

{¶32} Before we address the assignments of error challenging the evidence in support of the permanent-custody award, we first address Kenneth's second assignment of error. In it, he contends that the trial court erred by not appointing independent counsel for W.W.

{¶33} Under R.C. 2151.352, a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances.[3] This court held in *In re Walling* that circumstances necessitating independent counsel include when the child's wishes conflict with the child's GAL's recommendation and the GAL is serving as the child's attorney.[4]

{¶34} In this case, unlike in *In re Walling*, W.W.'s GAL did not serve as the child's attorney. This difference, however, is without consequence for our inquiry; the court appointed an attorney to take legal actions on behalf of the GAL in the best interest of W.W. The issue then is whether W.W.'s wishes conflicted with those of his GAL.

{¶35} W.W.'s GAL recommended that permanent custody be granted to HCJFS. The magistrate investigated as to whether W.W.'s wishes conflicted with the recommendation of his GAL and held an in camera interview of the child. The magistrate determined that W.W. "did not consistently express a desire to return home" and that the

---

[3] *In re Williams*, supra, at syllabus.
[4] *In re Walling*, 1st Dist. No. C-050646, 2006-Ohio-810, ¶24, cited in *In re Graham,* 1st Dist. No. C-060129, 167 Ohio App.3d 284, 2006-Ohio-3170, 854 N.E.2d 1126, ¶32. See, also, Sup.R. 48(D)(8) ("When a guardian ad litem determines that a conflict exists between the child's best interest and the child's wishes, the guardian ad litem shall, at the earliest practical time, request in writing that the court promptly resolve the conflict by entering appropriate orders.")

record did not contain any evidence that W.W.'s wishes conflicted with those of W.W.'s GAL. With respect to this later comment, the magistrate noted that "the parents declined to present evidence on this issue." Thereafter, the magistrate declined to appoint independent counsel for him.

{¶36} Kenneth challenges the magistrate's finding by arguing that W.W.'s therapy notes demonstrate a conflict. But Kenneth did not raise this issue before or during the permanent-custody hearing, when any error could have been corrected. Nor did Kenneth raise this issue in his objections to the magistrate's decision.

{¶37} An objection to a magistrate's decision "shall be specific and state with particularity all grounds for objection."[5] Juv.R. 40(D)(3)(b)(iv) and its counterpart in the civil rules, Civ.R. 53(D)(3)(b)(iv), provide that "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, * * *, unless the party has objected to that finding or conclusion * * *."[6] While these rules also require the trial court to undertake an independent examination of the magistrate's decision even if no objections are filed, this analysis is limited to errors of law or other defects "on the face of the magistrate's decision."[7]

{¶38} We decline to find plain error because the record, including the evidence Kenneth cites, demonstrates only that W.W. was "confused about whom he wished to live with." The magistrate interviewed the 10-year-old child and confirmed this.[8] Without evidence that W.W. consistently expressed a desire to live with his parents, W.W.'s wishes did not conflict with those of his GAL.[9] Thus, we conclude that the magistrate was not

---

[5] Juv.R. 40(D)(3)(b)(ii); Civ.R. 53(D)(3)(b)(ii).
[6] See *In re Etter*, 134 Ohio App.3d 484, 491, 731 N.E.2d 694 (citing identical language found in prior versions of the rules.)
[7] See Juv.R. 40(D)(3)(c) and Civ.R. 53(D)(3)(c).
[8] Kenneth does not challenge the magistrate's findings related to the content of the in camera interview, and the transcript from this interview is not a part of the record for this appeal.
[9] *In re Graham*, supra, at ¶37-39.

required to appoint counsel, and that magistrate and the trial court did not error in failing to do so.[10]  Accordingly, we overrule Kenneth's second assignment of error.

### III.  Admission of Recordings

{¶39}  Next, we address Diana's first assignment of error.  In it, she contends that the trial court erred by admitting into evidence the telephone messages that she and Kenneth left for numerous service HCJFS employees and case-plan service providers involved in the case.  Diana and Kenneth made the challenged recorded telephone messages during a period from April to October 2010.

{¶40}  At the permanent-custody hearing, Diana objected to the admission of the recordings on the basis of relevancy and redundancy. HCJFS argued the recordings were highly relevant to demonstrate that the parents had failed to remedy the issues that brought W.W. into the Agency's care—Diana's compulsions and emotional and behavioral instability, and Kenneth's anger and intimidation problems—despite the parents' physical attendance and completion of some of the services provided.

{¶41}  With respect to Diana's objection based on redundancy, HCJFS argued that the calls were redundant only to the extent that Diana and Kenneth left messages for so many different individuals and over such a long period of time, facts that further established the relevancy of the recordings. The magistrate overruled the objection and allowed the recordings into evidence.

{¶42}  Diana maintains that the recordings were not relevant.  Her position, essentially, is that her manic and compulsive behavior exhibited with these phone calls had no bearing on her ability to provide an adequate home for W.W.  Alternatively, she argues that any relevancy of the telephone messages is substantially outweighed by the danger of unfair prejudice.  She explains that the unfair prejudice involves the trial court's

---

[10]  Id.

desire to punish her because of the content of these messages in which she and Kenneth threatened legal action, criticized the actions of people trying to help them, and made accusations of abuse.

{¶43} Generally, we review evidentiary rulings under an abuse of discretion standard. But because Diana failed to object to the magistrate's decision on this ground, we review only for plain error.[11]

{¶44} We find no error, much less plain error, in the admission of the challenged recordings. These recordings, some made just weeks before the permanent-custody hearing, were extremely relevant to show that Diana still suffered from compulsions and had not achieved emotional and behavioral stability. These defects had directly led to W.W.'s neglect and dependency, and they had indirectly affected Diana's ability to parent W.W. by creating a barrier that prevented Diana from receiving the services she needed to control these defects. And the evidence demonstrated that Kenneth still suffered from anger-management issues and that he was either unwilling or unable to help Diana control her compulsions. Further, the relevancy of this evidence was not substantially outweighed by any "unfair prejudice" as contemplated by Evid.R. 403(A). Accordingly, we overrule Diana's first assignment of error.

### IV. Termination of Parental Rights

{¶45} Finally, we address Kenneth's first assignment of error and Diana's second assignment of error. They both contend that the trial court erred in granting permanent custody to HCJFS, essentially challenging the weight of the evidence adduced before the magistrate.

{¶46} The trial court's determination to award permanent custody must be supported by clear and convincing evidence. "Clear and convincing evidence" is evidence

---

[11] See Juv.R. 40(D)(3)(b)(iv); Civ.R. 53(D)(3)(b)(iv).

sufficient to "produce in the mind of the trier of fact[] a firm belief or conviction as to the facts sought to be established."[12] As an appellate court, we do not review the juvenile court's decision under an abuse-of-discretion standard;[13] rather, we must examine the record and determine if the juvenile court had sufficient evidence before it to satisfy the statutory clear-and-convincing standard.[14] We will not substitute our own judgment for that of the trial court applying a clear-and-convincing standard where some competent and credible evidence supports the trial court's determinations.[15]

{¶47} An agency can obtain permanent custody of a child by more than one method. In this case, HCJFS moved for permanent custody under R.C. 2151.413(A), after obtaining temporary custody under R.C. 2151.353(A)(2). R.C. 2151.414 governs the procedures a juvenile court must follow and the findings it must make before granting a motion for permanent custody filed under R.C. 2151.413.[16]

{¶48} R.C. 2151.414(B) establishes the test for the juvenile court to apply in ruling on a motion for permanent custody.[17] A juvenile court may grant permanent custody of a child to an agency in response to an agency's R.C. 2151.413(A) motion if the court finds by clear and convincing evidence that (1) permanent custody is in the best interest of the child and (2) one of four conditions set forth in R.C. 2151.414(B)(1)(a)-(d) applies.[18]

---

[12] *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶42, quoting *Cross v. Ledford* (1954), 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus.
[13] R.C. 2151.414(B); *In re Wilkinson*, 1st Dist. Nos. C-040182, C-040203, and C-040282, 2004-Ohio-4107, ¶37.
[14] See *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368, 481 N.E.2d 613; see, also, *In re Heston* (1998), 129 Ohio App.3d 825, 828, 719 N.E.2d 93, and *In re Walling*, supra, 2006-Ohio-810, at ¶15.
[15] *In re Baby Girl Doe*, 149 Ohio App.3d 717, 2002-Ohio-4470, 778 N.E.2d 1053, ¶89, citing *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus.
[16] *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶9, quoted in *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶22.
[17] See *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶31, quoted in *In re C.F.*, supra, at ¶23.
[18] Absent statutorily enumerated circumstances, the court must also find that the agency made reasonable efforts to reunify the family before terminating parental rights. *In re C.F.*, supra, at ¶43.

{¶49} The R.C. 2151.414(B)(1) conditions include that (1) "the child is abandoned";[19] (2) "the child is orphaned, and there are no relatives of the child who are able to take permanent custody";[20] (3) at the time the agency files the motion for permanent custody, "the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period" (the "12 of 22" provision);[21] or (4) none of the preceding conditions apply and "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents," based on an analysis under R.C. 2151.414(E).[22]

### A. "12 of 22" Provision

{¶50} In this case, HCJFS moved to modify temporary custody to permanent custody in July 2010 because of the length of time that W.W. had been in the temporary custody of the agency. Generally, where the agency has made reasonable efforts to reunify, an agency must file for permanent custody once a child has been in the agency's temporary custody for 12 or more months of a consecutive 22-month period.[23] A child shall be considered to have entered the temporary custody of an agency on the date the child is adjudicated pursuant to R.C. 2151.28 or the date that is 60 days after the removal of the child from the home, whichever is earlier.[24]

{¶51} "The '12 of 22' provisions set forth in R.C. 2151.413(D)(1) and R.C. 2151.414(B)(1)(d) balance the importance of reuniting a child with the child's parents against the importance of a speedy resolution of the custody of the child. Through the '12 of 22' provisions in the permanent-custody statutes, the legislature provides parents with

---

[19] R.C. 2151.414(B)(1)(b).
[20] R.C. 2151.414(B)(1)(c).
[21] R.C. 2151.414(B)(1)(d).
[22] R.C. 2151.414(B)(1)(a).
[23] R.C. 2151.413(D)(1) and 2151.413(D)(3); *In re C.W.*, 2004-Ohio-6411, at ¶20.
[24] R.C. 2151.414(B)(1).

12 months to work toward reunification before any agency can institute a permanent-custody action asserting R.C. 2151.414(B)(1)(d) grounds."[25]

{¶52} We note that the magistrate never cited R.C. 2151.414(B)(1)(d) or its "12 of 22" language in her decision. But the magistrate made the requisite finding that in July 2008 the state removed W.W. from the family home and placed him in foster care, where he remained throughout the proceedings. This finding is undisputed.

{¶53} Thus, the record clearly and convincingly demonstrates that when HCJFS moved for permanent custody in June 2010, W.W. had been in the temporary custody of the Agency for the requisite 12 months of the preceding 22-month period, the condition set forth in R.C. 2151.414(B)(1)(d).

### B. R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E) factors

{¶54} HCJFS additionally specified in its motion to modify temporary custody to permanent custody that W.W. could not be placed with either parent within a reasonable time or should not be placed with either parent, the condition set forth in R.C. 2151.414(B)(1)(a). Although not required to do so because the "12 of 22" condition had been met, the trial court also determined that W.W. could not be placed with either parent within a reasonable time or should not be placed with either parent, citing the factors set forth in R.C. 2151.414(E)(1) and (2).

{¶55} R.C. 2151.414(E)(1) provides: "Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to

---

[25] *In re C.W.*, supra, at ¶22, internal citations omitted. But, see, *In re M.J.*, 8th Dist. No. 95131, 2010-Ohio-5793, ¶12 (suggesting that the agency must wait for the expiration of 22 months even when the child has been in the temporary custody of the agency for 12 consecutive months.)

substantially remedy the conditions causing the child to be placed outside the child's home."

{¶56} R.C. 2151.414(E)(2) provides: "Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year * * * ."

{¶57} Kenneth challenges the trial court's determination that W.W. could not be placed with either parent within a reasonable time.[26] Diana attacks the trial court's finding with respect to both of the R.C. 2151.414(E) factors.

{¶58} We need not consider these findings in determining whether one of the criteria in R.C. 2151.414(B)(1) has been satisfied because it is undisputed that R.C. 2151.414(B)(1)(d), which is based on the length of the temporary custody, has been met by clear and convincing evidence. However, we will review these findings because HCJFS has not taken the position that the findings were unnecessary and because we believe the magistrate found these factors significant when determining the best interest of W.W.

### Placement with Either Parent within a Reasonable Time

{¶59} The magistrate found that HCJFS had diligently attempted to implement reasonable case-plan services for both Kenneth and Diana, but that the parents' behavior and emotional instability prevented them from effectively engaging in and benefitting from these interventions.

{¶60} Both Kenneth and Diana contend that HCJFS's efforts at reunification were not reasonable and diligent, and that they had substantially remedied the conditions causing W.W's removal. Therefore, they argue, the evidence does not support the

---

[26] Kenneth additionally argues that R.C. 2151.414(B)(2) applies to this case. We disagree. That statute applies when HCJFS moves for permanent custody under R.C. 2151.413(D)(2) after a court has made a finding under R.C. 2151.419(A)(2)'s bypass provision.

17

magistrate's finding. But neither objected to the magistrate's decision on this specific basis. Thus, they have waived this argument, absent plain error.[27] The plain-error doctrine is reserved for " 'exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process * * *.' "[28]

{¶61} *Reasonable and Diligent Efforts.* Case plans are tools to facilitate reunification; therefore, "the plan and the agency's efforts should account for the respective abilities of the parents and children in pursuing individualized concerns, goals, and steps necessary for reunification."[29] But the agency's responsibility to facilitate reunification is not unlimited. The issue is whether the agency's case planning and efforts were reasonable and diligent, and not "whether there was anything more" that the agency could have done.[30] In this case, the Agency began a case plan before W.W.'s removal from the home, and a case plan continued through the proceedings.

{¶62} Diana refers to the case plan that HCJFS implemented on her behalf as "cookie-cutter," and she describes it as one that she was incapable of following because of her "condition." Similarly, amicus curiae, Diana's GAL, suggests that the case plan approved by the court was "fatally flawed" because it did not include services to identify and treat Diana's TBI and possible brain damage.

{¶63} Both arguments rely on the evaluation of clinical psychologist Mary Eileen Buban, who, due to Diana's tarrying, did not evaluate Diana until after the permanent-custody hearing had started. After a short evaluation, Dr. Buban diagnosed Diana as suffering from "dementia due to brain trauma with memory and behavioral features,"

---

[27] See Juv.R.40(D)(3)(b)(iv) and Civ.R. 53(D)(3)(b)(iv).
[28] *In re Etter*, supra, 134 Ohio App.3d at 492, quoting *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 122-123, 679 N.E.2d 1099.
[29] *In re Leveck*, 3rd Dist. Nos. 5-02-52, 5-02-53, and 5-02-54, 2003-Ohio-1269, ¶10.
[30] Id.

including "obsessive compulsive behaviors when under stress." She also recommended a "neuropsychological assessment" to identify Diana's strengths and weaknesses.

{¶64} Dr. Buban did not testify at the permanent-custody hearing. In her report, which was admitted into evidence, Dr. Buban expressed "concern" that Diana's "unique needs have not been adequately assessed and addressed by the various providers involved with her case."

{¶65} But Dr. Buban's statement criticizing the case plan was conclusory, and, notably, she did not suggest what services would be helpful other than the neuropsychological assessment. The Agency relied on service providers such as Dr. Aziz and Dr. Scudder, who both diagnosed Diana with a traumatic brain injury and bipolar disorder. Despite the representations of Diana and her GAL otherwise, the evidence demonstrated that Dr. Aziz and Dr. Scudder treated her for these conditions. Her treatment goals included stabilizing her mood, reducing posttraumatic symptoms, and decreasing anxiety.

{¶66} Diana attended psychotherapy for over a year and she complied with the recommended medication regime. During this time of compliance, Dr. Aziz reported that Diana's response to the treatment was "very satisfactory" and that she could manage her illness and parent W.W. But in January 2010, Diana self-terminated the therapy and the Depakote, her psychiatric medication. Her emotional and behavioral stability declined significantly, as demonstrated by the voluminous communications she had with employees of HCJFS, service providers, and attorneys. The magistrate accurately described these communications as "marked by threats, paranoid beliefs, and delusional thinking." HCJFS presented ample evidence that Diana could not manage her illness without complying with the mental-health services provided in the case plan.

{¶67} Diana also challenges the Agency's inclusion of group therapy as part of her reunification plan, arguing essentially that she could not function in a group. Part of Diana's case plan included participation in group counseling on domestic violence and individual parenting training, both through Alternatives to Violence. Diana claims that Denise Gray, Diana's service provider, testified that Diana did not have the capacity to learn and function in a group setting.

{¶68} But Gray did not testify that Diana could not function in a group setting. She testified that Diana had the capacity to function in a group setting, but that Diana chose not to do so and refused to focus on the materials in the class.

{¶69} In addition to the group therapy, Diana received significant one-on-one services. Gray testified that she provided individual parenting training to Diana, and that Diana also failed to successfully complete the training. In fact, after Gray's repeated efforts to redirect Diana's dialogue to improving her parenting skills for reunification, Diana pursued an action against Gray for violating her freedom of speech. Gray, who testified that she had successfully worked with individuals with the same disorders as Diana, was forced to terminate Diana from both the domestic-violence and parenting programs after a few sessions, less than 25 percent of the programs. Gray explained to HCJFS that she terminated Diana because Diana "has her own ideas of what she needs from our classes. She has demonstrated that she is unwilling to attempt to process any information that does not fit her agenda."

{¶70} We note also that HCJFS arranged for Diana to attend a different domestic-violence support group after her termination from the Alternatives to Violence program, but Diana discontinued her participation after a few sessions.

{¶71} In addition to the domestic-violence counseling, the individual parenting classes, and the mental-health services, HCJFS provided a caseworker, Tarver, and weekly

supervised parent/child visits. Beginning in September 2008, these visits included parent coaching and therapeutic supervision to enhance the parent/child interaction and to immediately correct both parents' deficient parent skills. Further, family therapy was a part of the case-plan services. This therapy did not occur for several reasons, including the recommendation by W.W.'s individual therapist that W.W. was not ready for it due to delays in his individual therapy.

{¶72} The parents blame the Agency for the transportation problems that delayed W.W.'s individual therapy, and cite this delay as an example of the Agency's lack of diligence. But the evidence supported the magistrate's finding that the parents contributed significantly to the transportation problems by making false abuse accusations against Tarver, thereby preventing Tarver from assisting in the transportation. And W.W.'s allegations of sexual abuse against his father to his individual therapist in March 2010 significantly impeded the goal of family therapy. Further, the trial court cannot deny an agency's permanent-custody motion "solely because the agency failed to implement any particular aspect of the child's case plan."[31]

{¶73} Other circumstances impeded HCJFS's coordination of services, such as the parents' move to Clinton County, the expiration of contracts between HCJFS and service providers, the discontinuation of services by the providers because of Diana's accusations and both parents' failure to abide by the providers' policies. Despite these obstacles, the Agency worked persistently to continue with the reunification plan. This persistence was not enough to overcome both Kenneth's and Diana's efforts to derail the reunification.

{¶74} The magistrate's finding that HCJFS acted reasonably and with diligence to effect reunification is supported by the record.

---

[31] R.C. 2151.414(C).

{¶75}  *Failure to Remedy the Conditions Causing the Removal.*  Both parents argue that they successfully had remedied the conditions causing W.W. to be removed from the home, citing evidence of their participation in services and the magistrate's finding that there had been no new allegations of domestic violence.  Neither parent specifically objected to the magistrate's conclusion that the conditions had not been remedied or to the magistrate's factual findings that supported the conclusion.  Thus, they have waived all but plain error, and we decline to find plain error.

{¶76}  Kenneth specifically challenges the magistrate's finding that he and Diana used age-inappropriate parenting techniques at every supervised visit.   But Karen Black, the visitation facilitator from April 2010 to August 2010, testified that based on her own observations and her review of the records of the other facilitators, the parents' treatment of W.W. in an age-inappropriate manner was an "ongoing issue" during the visitations, and that based on her direct observations, "it still [wa]s happening weekly, but not throughout the entire time weekly."   Black explained that the parents stifled W.W.'s independence by treating him like a small child—coddling him, allowing him to sit on their laps, rocking him and patting him, and giving into his demands to avoid upsetting him. While Black conceded that the parents had made progress and appeared to be internalizing the corrections enough to allow some unsupervised visitation, she concluded that the parents still required some ongoing supervised visitation.

{¶77}  Kenneth also challenges the magistrate's finding that he refused to engage in mental-health services.  He contends that he fully complied with his case plan's requirement that he participate in a mental-health assessment and follow the recommendations arising from the assessment.

{¶78}  Kenneth was evaluated by Kathleen Ann Murphy, an assessment specialist for the Mental Health & Recovery Center of Clinton County.  Murphy assessed Kenneth as

having a narcissistic personality disorder and an "adjustment reaction." But Murphy did not order any treatment at that time, considering it feckless, as Kenneth denied that he had a mental-health issue. The magistrate, however, ordered that a course of action be taken to address Kenneth's mental-health issues. At one point, Kenneth agreed to see Diana's psychologist, but did not follow through with the psychotherapy requirement.

{¶79} Kenneth disagreed with his diagnosis and sought a second opinion from William Walters, a clinical psychologist. Although Dr. Walters did reject Murphy's assessment of narcissistic personality disorder, he also found an adjustment disorder. Importantly, in making his diagnosis, Dr. Walters used limited collateral information, gaining information primarily from Kenneth, and Dr. Walters reported that even with his diagnosis, Kenneth still needed psychotherapy.

{¶80} The record contains competent, credible evidence to support the magistrate's finding that Kenneth had ultimately refused to engage in mental-health services as required by the reunification plan.

{¶81} Importantly, as the magistrate found, the evidence at the permanent-custody hearing also demonstrated that the parents had not fully internalized the lessons from the case-plan objectives. The evidence showed that even though Diana had completed an on-line parenting course, she would continue to make bad decisions concerning the parenting of W.W. and that Kenneth would support those bad decisions. Kenneth testified that when Diana wanted him to participate in the clearly inappropriate phone calls, he had first resisted. But when she continued to insist, he complied with her request to avoid an argument. And when asked about the option of the court returning W.W. to his custody, but not Diana's, he candidly testified that "[t]he fact that he would be returned to my custody would just be basically a word, because we would both, you know, have care of him, and wouldn't be any different than if they returned him to both of us

23

really." Further, he indicated that his responsibility to protect W.W. would be the same as before W.W.'s removal, because even then he had directed W.W. when Diana had engaged in compulsive or inappropriate behavior.

{¶82} We reject the parents' claim that the evidence does not support the magistrate's finding that they had failed to remedy the conditions that led to W.W.'s removal.

### *Chronic mental illness*

{¶83} Diana challenges the trial court's adoption of the magistrate's finding, In accordance with R.C. 2151.414(E)(2), that her mental illness prevents her from providing an adequate home environment for W.W. Specifically, she argues that HCJFS failed to establish that her erratic, explosive, and compulsive behavior during reunification services, including false accusations of abuse, had impacted W.W.

{¶84} First, we reject Diana's claim that HCJFS was required to show that her destructive behavior during reunification services impacted W.W. Diana relies on this court's holding in *In re Walling*,[32] which involved the sufficiency of the evidence to support a finding of dependency under R.C. 2151.04(B). That section defines a dependent child as any child who "lacks adequate parental care by reason of the mental or physical condition of the child's parents * * * ." We held in *In re Walling* that to support a finding of dependency under R.C. 2151.04(B), the agency must demonstrate that the parent's mental condition actually interfered with the parent's ability to provide adequate care for the child.[33]

{¶85} But this appeal does not involve a challenge to the juvenile court's 2008 final order adjudicating W.W. dependent and neglected and granting temporary custody

---

[32] Supra.
[33] Id. at ¶17.

of W.W. to the Agency. The time to appeal that order has long passed.[34] Thus, the holding of *In re Walling* concerning the sufficiency of the evidence for dependency does not apply.

{¶86} Second, we note that the record does contain evidence that, even with Diana's limited exposure to W.W. during the reunification services, her failure to control her mental illness directly affected W.W. For example, Tarver testified that W.W. became visibly upset watching his mother lose control during one of the supervised visits, after she was reprimanded for failing to follow the rules of the Family Nurturing Center.

{¶87} The record contains ample evidence that Diana discontinued her mental-health treatment and case-management services that were aimed at controlling the mental illness and disruptive behavior that led to W.W.'s removal. We note that because of Diana's erratic, explosive, and compulsive behavior before removal, which impacted W.W. and contributed to both his dependency and his neglect, the court ordered as part of the reunification plan that Diana "shall achieve mental/behavioral health stability" and that she "shall comply with case management, therapy, psychiatric services, and medication."

{¶88} Under these circumstances, the evidence supported the magistrate's finding that the severity of Diana's mental illness rendered her unable to provide an adequate permanent home for W.W. at the time of the hearing and, as anticipated, within one year from the hearing.

{¶89} In summary, competent credible evidence supports the trial court's determination that W.W. had been in the temporary custody of the Agency for the requisite period of time as set forth under R.C. 2151.414(B)(1)(d), and that W.W. could not be placed with either parent within a reasonable time and should not be placed with either

---

[34] See, *In re H.F.*, 120 Ohio St.3d 499, 2008-Ohio-6810, 900 N.E.2d 607, syllabus ("An appeal of an adjudication order of abuse, dependency, or neglect and the award of temporary custody pursuant to R.C. 2151.353[A][2] must be filed within 30 days of the judgment entry pursuant to App.R. 4[A].")

parent as set forth under R.C. 2151.414(B)(1)(a). As such, one half of the test set forth in R.C. 2151.414(B) was satisfied.

### C. Best Interest

{¶90} In assessing the best interest of the child, the court is directed to "consider all relevant factors," including those expressly set forth in R.C. 2151.414(D)(1). These include the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly or through the child's guardian ad litem; (3) the custodial history of the child, including whether the child has been in the temporary custody of public or private children services agencies for twelve or more months; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.[35]

{¶91} Additionally, the court must consider the factors listed in R.C. 2151.414(E)(7) through (11), if applicable to the parents or child.

{¶92} The evidence demonstrated that W.W. had resided with the same foster family since August 2008. When W.W. entered foster care, he displayed significant emotional, behavioral, and academic delays. Additionally, he struggled with issues related to poor hygiene, inadequate dental care, and poor nutrition. These conditions were caused by parental neglect.

{¶93} W.W. made significant advancement in all areas while living with the foster family, and he developed a strong and positive attachment to the foster parents and their extended family. W.W.'s foster father unequivocally testified that the foster family would like to adopt W.W.

---

[35] R.C. 2151.414(D).

{¶94} Early in his placement, W.W. attempted to engage in inappropriate sexual contact with a granddaughter of the foster parents. He received counseling, which revealed his concerns over the domestic violence between his parents. He later made allegations of sexual abuse by his father, but no criminal charges were pursued due to lack of evidence.

{¶95} W.W. retained a strong bond with his parents, but he was ambivalent about returning to his parents' care. And the parents were unable to remedy the conditions that led to W.W.'s removal.

{¶96} W.W.'s parents were provided weekly supervised visitation with W.W. after his removal, although Kenneth's visitation was suspended for several months after W.W. made allegations of sexual abuse against him. According to Karen Black, the visitation facilitation coordinator, W.W. enjoyed these visits, but his parents did not consistently interact with him in an age-appropriate manner, requiring the staff to redirect them. At the time of the permanent-custody hearing, Black could not even recommend the termination of supervised visitation.

{¶97} The magistrate found, and the evidence demonstrated, that Diana's mental illness prevented her from providing an appropriate home environment for W.W. as evidenced by her refusal to send him to school, her inability to provide appropriate meals, the lack of proper hygiene and attention to health care, and her isolation of W.W., which at least contributed to his emotional and behavioral delays. Notwithstanding her diagnosis of bipolar behavior, her TBI, and her history of obsessive-compulsive behavior, in January 2010 she stopped taking her medication, she discontinued her attendance in counseling and psychiatric appointments, and she terminated case-management services.

{¶98} As part of the case plan, W.W.'s parents were ordered to participate in domestic-violence counseling because of their history of domestic violence and their

inability to protect W.W. from this hostility. Kenneth resisted the counseling, as demonstrated by the extraordinarily long time before his completion of the AMENDS program. But there was evidence that Kenneth had benefitted from the AMENDS program because Diana had not made any new reports of domestic violence after W.W.'s removal. This apparent progress, however, was undermined by Kenneth's participation in the inappropriate and angry telephone messages to HCJFS employees and case-plan service providers.

{¶99} Further, before W.W.'s removal from the family home, Kenneth was either unable or unwilling to provide protection in the home for W.W. The evidence at the permanent-custody hearing demonstrated that this would continue. Kenneth placated Diana when he should have corrected her; he characterized her rants and accusations as "therapeutic," and he apparently acquiesced in her termination of mental-health treatment. And he testified that if the court returned W.W. to his custody only, it would be no different than if the court had awarded custody to Diana also.

{¶100} With respect to W.W.'s wishes, the magistrate noted that W.W.'s GAL had recommended the grant of permanent custody so that W.W. could be adopted by his foster family. The juvenile court may consider the child's wishes as expressed directly by the child or through the child's GAL.[36] The magistrate also considered that W.W. had enjoyed his supervised visits, but that he had been ambivalent about returning to his parents' care. The magistrate considered this ambivalence in the context of W.W.'s guarded discussion of his experiences while in his parents' care.

{¶101} Finally, the evidence demonstrated that HCJFS could not locate any relatives or friends who had the desire and the ability to provide appropriate care for W.W.

---

[36] *In re C.F.*, supra, at ¶55.

{¶102} Amicus curiae Diana's GAL urges this court to reverse the trial court's judgment based on the Ohio Supreme Court's decision in *In re D.A.*[37] In that case, the court reversed a judgment that terminated the parental rights of a mentally-retarded couple, holding that in a permanent-custody hearing, a trial court may not determine a child's best interest based "solely on the limited cognitive abilities of the parents."[38] The court found persuasive the absence of evidence of harm or threat of harm to the children, and that the parents' low cognitive abilities constituted the sole reason for the termination of the parental rights.

{¶103} Although there are some similarities between the situation in this case and that in *In re D.A.*, there are many differences. The primary focus of this case was not on Diana's limited cognitive abilities, but on the parents' mental-health and domestic-violence issues and their neglect of their child's welfare. And the record in this case contains clear and convincing evidence of a threat of harm to W.W. due to the parents' failure to remedy the conditions that led to W.W.'s removal.

{¶104} Importantly, Diana stopped the therapy and medication designed to help stabilize her mental health. Kenneth denied that he had mental-health issues and needed therapy. The voluminous, threatening and angry telephone calls the parents made in the months before the permanent-custody hearing demonstrated that despite the Agency's efforts, W.W. would be returned to a chaotic, unstable, and violent household, much like the environment from which he had been removed, and that Kenneth would condone Diana's inadequate parenting and fail to provide protection in the home for W.W. Moreover, the record demonstrates that the diagnosis of the parents' mental illnesses is only one of many factors that contributed to the termination of parental rights.

---

[37] 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829.
[38] Id. at syllabus.

{¶105} We are fully aware that suitable parents have a "paramount" right to the custody of their minor children[39] and that "the permanent termination of parental rights is the family law equivalent of the death penalty in the criminal case."[40]  But the parents' fundamental interest is not absolute and, at the dispositional phase, the parents' interest takes a back seat to the best interest of the child.[41]

{¶106} In light of the above, we hold that the juvenile court's decision that it was in the best interest of W.W. to terminate Kenneth's and Diana's parental rights was based on clear and convincing evidence.  As such, the other half of the test set forth in R.C. 2151.414(B) was satisfied.

{¶107} Accordingly, we overrule Kenneth's first and Diana's second assignment of error.

### V. Conclusion

{¶108} We affirm the judgment of the juvenile court granting permanent custody of W.W. to HCJFS.

Judgment affirmed.

SUNDERMANN, P.J., HENDON and CUNNINGHAM, JJ.

Please Note:

The court has recorded its own entry on the date of the release of this decision.

---

[39] Id. at ¶10, internal citations omitted.
[40] Id., internal citations omitted.
[41] Id. at ¶11.