[Cite as *In re A.D.*, 2022-Ohio-2346.]

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: A.D., JR. | : | APPEAL NO. C-220128 |
| | | TRIAL NO. F-19-0411Z |
| | : | |
| | : | *O P I N I O N.* |

Civil Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: July 6, 2022

*Jeffrey J. Cutcher*, for Appellant Father,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Madeline Schneider*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Megan E. Busam*, Assistant Public Defender, for Guardian ad Litem for A.D., Jr.

**ZAYAS, Presiding Judge.**

{¶1} Appellant father appeals the judgment of the Hamilton County Juvenile Court granting permanent custody of his child, A.D., Jr., ("A.D.") to the Hamilton County Department of Job and Family Services ("HCJFS"). For the following reasons, we affirm the judgment of the juvenile court.

## Factual and Procedural History

{¶2} On April 2, 2019, HCJFS filed a complaint for temporary custody of A.D. The complaint alleged that A.D. had undiagnosed behavioral concerns that required intensive and constant care. It further alleged that A.D. was diagnosed with Sensory Disorder, was believed to be an autistic child, was non-verbal, and appeared to be developmentally delayed. Regarding mother, the complaint alleged that she was currently homeless and unable to provide for A.D.'s basic needs. Regarding father, the complaint alleged that he was employed as a truck driver and was gone for months at a time, was without stable housing, and was not financially prepared to care for A.D.'s special needs. Interim custody was granted to HCJFS that same day and a guardian ad litem was appointed.

{¶3} On August 13, 2019, A.D. was adjudicated dependent and neglected after father admitted dependency and stipulated that his employment prevented him from caring for A.D., and the court found that A.D. had suffered physical abuse by mother and that mother had "exited," leaving A.D. behind. Father agreed to a temporary custody plan and A.D. was committed to the temporary custody of HCJFS. The initial case plan averred that father should obtain housing, be involved in A.D.'s medical appointments and assessments, and attend all recommended classes to increase his understanding and ability to address A.D.'s specific and immediate needs.

It also asserted that father should work to build a supportive environment that was in the best interest of A.D.'s particular needs.

{¶4} The juvenile court conducted a review hearing on October 14, 2019. The entry from the court indicated that no parent was engaged in regular visitation or services and said that father's stated intentions of gaining new employment and a stable residence had yet to be recognized. Temporary custody to HCJFS was extended on March 4, 2020, after all parties agreed to the extension.

{¶5} On August 18, 2020, HCJFS filed a motion to modify temporary custody to permanent custody. The motion alleged that A.D. did not have a relationship with either parent, that neither parent was involved in A.D.'s medical or therapeutic care, and that father had not visited with A.D. since November of 2019. An amended case plan was approved by the court on April 16, 2021, which requested that father's visitation be changed to supervised visitation, that father complete a diagnostic assessment of functioning, and that father follow all service recommendations and sign all needed release forms. The case plan indicated that father now had stable housing but was still working as a truck driver.

{¶6} The guardian ad litem filed her report on July 1, 2021, recommending that the juvenile court grant permanent custody of A.D. to HCJFS. Hearings were held before a magistrate on July 13 and August 25, 2021, at which the HCJFS caseworker and father testified.

{¶7} The HCJFS caseworker testified that father ultimately completed a diagnostic assessment of functioning, obtained housing, and obtained local employment. Regarding visitation, the caseworker testified that, when the case was transferred to him in October of 2020, he was told that father had not visited A.D. since November of 2019. Father started visits again in March of 2021 and completed

3

four visits. The caseworker explained that an "incident" occurred with father, which halted visitation in April of 2021 for about two months. A police report in the record indicated that father had abandoned his vehicle in the middle of the highway and was acting erratically. Father gave the caseworker several reasons why the incident occurred, but ultimately acknowledged that he had accessed marijuana laced with embalming fluid which caused the incident. Visitation only resumed once the caseworker contacted father. Father did not contact the caseworker to ask that visitation be resumed. The caseworker said that father then had one visit with A.D. two weeks prior to the first hearing and one visit in between the first and second hearing.

{¶8} Regarding father's ability to care for A.D., the caseworker testified that there was no evidence that father had the ability to meet A.D.'s special needs and said there were concerns about whether father fully understood A.D.'s disabilities. The caseworker visited a school, located by father for A.D., called KidsLink, but A.D. had yet to be accepted into the program. The cost for the program was $82,500, and the school said they had to go through the Streetsboro Board of Education to find out whether the cost would be covered. The school is also closed several days throughout the month and sometimes up to two weeks during the month, which does not align with father's work schedule. Father had not indicated any plans to the caseworker for childcare outside of school.

{¶9} The caseworker testified that A.D. was bonded with his foster family and seemed happy. He said the interactions between A.D. and his foster mother had always been positive, and his foster mother had expressed an interest in adopting him. He explained that A.D. had shown improvement with his behaviors since being placed with his foster mother and receiving services through Children's Hospital and

attending the Kelly O'Leary Center, which is a specialized school for autistic children. A.D. also qualified for disability services. Father did not participate in any of these services or school meetings and did not attend any of A.D.'s medical appointments. The caseworker agreed that father had no knowledge of the services and support that A.D. had in place.

{¶10} Father testified that, for the past two years, he worked for a truck auction company doing pressure washing. With this position, he traveled all over the United States and lived on the road. However, he said he would come back to the area to spend a lot of time with his mother. In February of 2021, he sought new employment so he could stop traveling and get custody of his son. He said that he now works for a place called Cabmat, making $18 an hour. When asked how long he had been in this position, he said he had just recently completed his 90-day trial period. Father testified that he had friends who lived close to him who agreed to help with A.D. When asked how he anticipated KidsLink being paid for, father said, "I mean, he got grants because he's special needs, but, I mean, that's a lot. We would have to – we'd have to do some loans or something or another, but I think I make enough money to do it, but it's going to be hard on me and [A.D.]." Father agreed that he intended to apply for any benefits that A.D. would be entitled to. When asked what arrangements he made for alternative care for A.D. during school breaks, he said that the daughter of his friend had agreed to "help with the situation." He denied knowing what the school's hours were. When asked if he had identified any daycares that met A.D.'s needs, he replied, "I mean, what I got – what I got is a little bit better for my needs as far as, you know, being close by." He claimed that he talked to one daycare but only asked what was needed for enrollment.

5

{¶11} Father could not testify as to when his visitation began after A.D. was placed in the care of HCJFS. He said he visited A.D. "quite frequently, but not what you all want." He claimed that he visited A.D. four times in 2020. In total, he claimed that he visited A.D. eight or nine times, which included four times when he tried to visit but an agreement could not be reached about a meeting time. He agreed that he went more than 90 days in 2020 without visiting or communicating with A.D.

{¶12} Father denied using any "nonprescription drugs" for the last five months. He testified that his apartment had two bedrooms, one of which was set up for A.D. He agreed that he would be involved in A.D.'s medical services and appointments if A.D. was placed with him. He claimed that he was previously involved in meetings where they were talking about A.D. He described the meetings as progress reports over the phone. He said, "I just know we was talking about [A.D.] and everything. They'd be talking about him, so I just really didn't even want to hear none of that." He ultimately denied having attended any of A.D.'s medical appointments. When asked if he received medical insurance through his employer, he responded, "I just got the package. I did dental. Can't do heath because of child support, and it would just take too big of a chunk, so I got dental." When asked if he had taken any special-needs classes, medical classes to help with any medical issues, or parenting classes to help with a special needs child, he said no.

{¶13} The magistrate entered a decision on October 1, 2021, granting permanent custody of A.D. to HCJFS. The magistrate found that A.D. had been in the temporary custody of HCJFS for at least 12 months of a consecutive 22-month period and that permanent custody to HCJFS was in A.D.'s best interest. Father filed objections to the magistrate's decision on October 14, 2021, arguing that the evidence was insufficient to support the magistrate's determination. The trial court heard

objections on January 6, 2022, and the matter was continued for a written opinion. The trial court entered its decision on February 17, 2022, which overruled the objections, adopted the magistrate's decision, and granted permanent custody of A.D. to HCJFS. Father now appeals, raising two assignments of error for our review.

**Law and Analysis**

{¶14} In his first assignment of error, father argues that the trial court's best interest determination was not supported by sufficient evidence. In his second assignment of error, father argues that the trial court erred in finding that he abandoned A.D. Because the assignments of error are interrelated, we address them together.

{¶15} "R.C. 2151.414(B)(1) sets forth a two-pronged test for courts to apply when determining whether to grant a motion for permanent custody to a public children's services agency." *In re R/G Children*, 1st Dist. Hamilton No. C-200394, 2021-Ohio-839, ¶ 10. " 'The statute requires the court to find, by clear and convincing evidence, that: (1) one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) permanent custody is in the best interest of the child under R.C. 2151.414(D)(1)(a)-(e).' " *Id.*, quoting *In re D.M.*, 1st Dist. Hamilton No. C-200043, 2020-Ohio-3273, ¶ 23. "Clear and convincing evidence 'is evidence sufficient to "produce in the mind of the trier of fact[] a firm belief or conviction as to the facts sought to be established." ' " *Id.* at ¶ 11, quoting *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46. "An examination into the sufficiency of the evidence requires this court to determine whether the juvenile court had sufficient evidence before it to satisfy the clear-and-convincing standard." *Id.*, citing *In re R.M.S.*, 1st Dist. Hamilton Nos. C-190378, C-190386 and C-190405, 2019-Ohio-4281, ¶ 27.

7

**{¶16}** Under the first prong of the two-part test, the factor relevant to our analysis here is whether the child had been in the temporary custody of one or more public children's services agencies for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1)(d). The juvenile court found it to be uncontroverted that A.D. had been in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period. This finding is supported by the record and is not contested by father on appeal. Accordingly, we need only consider whether the trial court had sufficient evidence to find, by clear and convincing evidence, that a grant of permanent custody to HCJFS was in A.D.'s best interest.

**{¶17}** In determining the best interest of the child under the second prong of the two-part test, the juvenile court is required to consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

8

(e) Whether any of the factors in divisions (E)(7) to (11) of R.C. 2151.414

apply in relation to the parents and child.

R.C. 2151.414(D)(1). The factor relevant here from divisions (E)(7) to (11) of R.C. 2151.414 is whether the parent had abandoned the child. R.C. 2151.414(E)(10). "No single factor is given greater weight or heightened significance." *In re D.M.*, 1st Dist. Hamilton No. C-200043, 2020-Ohio-3273, ¶ 47, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57.

{¶18} In determining the best interest of A.D., the juvenile court found that father had limited contact with A.D. due to inconsistent visitation, and that A.D.'s current placement had been utilizing all available resources to meet A.D.'s special needs, while father had not been involved in any of these interventions. The court noted that A.D. had significant special needs, which appeared to be improving with his current foster placement. The juvenile court recognized that A.D. was unable to express his own wishes due to age and developmental challenges, acknowledged that A.D. had been in the care of HCJFS for more than 12 months of a 22-month period, had been at his current placement for more than a year and that foster mother wanted to adopt him. The juvenile court found that a legally secure placement could not be achieved without a grant of permanent custody to HCJFS because A.D. has special needs that could only be met by his foster family. The court noted that, had A.D. been with father in April of 2021, A.D. would have suffered another change in placement as father was involuntarily hospitalized due to the marijuana incident on the highway and said that father had no insight that his marijuana use caused him and those around him to be at risk. Lastly, the court found that father had abandoned A.D. by going more than 90 consecutive days without contacting or providing support for A.D. These findings are supported by the record.

{¶19} Without considering father's testimony that he visited A.D. four times in 2020, which the trial court was free not to believe, the record indicates that father only visited A.D. six times between November of 2019 and August of 2021, the date of the final hearing before the magistrate. Even considering father's testimony about his visits in 2020, father visited A.D., at most, ten times. Father's own testimony was that he visited A.D. only eight or nine times, which he said was including four visits that did not actually occur due to scheduling issues. There was no testimony or evidence that father maintained any sort of contact with A.D. in between those visits. Father agreed that he went more than 90 days with no contact with A.D. Visits were only resumed in 2021 after the HCJFS caseworker reached out to father. Father testified that his over-the-road job prevented him from visiting A.D. However, he also testified that he came back to the area to visit his mother while working in this position.

{¶20} Father argues that a legally secure placement could be achieved with him as he had independent and appropriate housing, had new permanent employment that did not require travel, and lived close to KidsLink, which was approved as an appropriate school for A.D. by the HCJFS caseworker. "A legally secure placement 'encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs.' " *In re D.V.*, 1st Dist. Hamilton Nos. C-210580 and C-210624, 2022-Ohio-1024, ¶ 30, citing *In re P. & H.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, ¶ 42.

{¶21} A.D. is an autistic child with numerous special needs. A.D. was first placed outside the home in April of 2019. The initial case plan indicated that father should obtain housing as soon as possible, be involved in all of A.D.'s medical appointments and assessments, and attend classes that would increase his understanding and ability to address A.D.'s needs. While father did ultimately obtain

housing and a new job where he was no longer required to travel, he did not do so until sometime in the beginning of 2021, approximately two years after A.D. was placed outside the home. In addition, father never attended any of A.D.'s medical appointments or assessments and was not involved in any way with A.D.'s care. While father testified that he did attend some meetings concerning A.D., he also said that he did not even care to listen to what was said at those meetings. There was no evidence that father took any affirmative steps to learn about A.D.'s special needs or how to care for A.D. Further, the school that father planned to enroll A.D. in was a school that cost over $80,000 a year and father did not have any concrete plans as to how the cost of the school would be paid. Father also did not have any concrete plans for childcare and said that he contacted daycares that were better for his needs, not A.D.'s needs.

{¶22} Father specifically takes issue with the juvenile court's finding under R.C. 2151.414(E)(10) that he abandoned A.D. by going more than 90 consecutive days without contacting A.D. HCJFS points out that father did not specifically challenge this finding in his objections to the magistrate's decision. A party's failure to specifically raise an issue in his or her objections to a magistrate's decision waives all but plain error. *See* Juv.R. 40(D)(3)(b)(ii) and (iv); Juv.R. 40(D)(4)(c) and (d); *In re H.J.H.*, 1st Dist. Hamilton No. C-200071, 2020-Ohio-3160, ¶ 7; *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 37; *In re Etter*, 134 Ohio App.3d 484, 492, 731 N.E.2d 694 (1st Dist.1998).

{¶23} A child is presumed abandoned "when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." R.C. 2151.011(C). Father does not deny that there were periods of more than 90 days that he did not maintain contact with A.D. Instead, he asserts that R.C. 2151.011(C)

only creates a rebuttable presumption of abandonment and argues that he sufficiently rebutted that presumption.

{¶24} First, father argues the presumption of abandonment was rebutted by showing that his inability to visit A.D. was due to his employment. However, while this might explain why he did not visit A.D., it does not explain why he did not maintain any contact with A.D. No evidence was presented of any attempts to maintain contact with A.D. while he was away. Father additionally argues that the presumption of abandonment was rebutted when he moved to Streetsboro, Ohio, obtained new permanent employment and had at least one visit with A.D. between the trial dates. However, this argument ignores the latter part of the statute which provides that a parent is presumed to have abandoned the child, *regardless* of whether the parent resumes contact after the period of abandonment. *See* R.C. 2151.011(C). Accordingly, we cannot find error, much less plain error, regarding the trial court's finding of abandonment.

{¶25} After our review of the record, we find that there was sufficient evidence before the trial court to find, by clear and convincing evidence, that a grant of permanent custody to HCJFS was in A.D.'s best interest. Accordingly, we overrule both assignments of error.

## Conclusion

{¶26} Having overruled both assignments of error, we affirm the judgment of the trial court.

Judgment affirmed.

**CROUSE** and **BOCK, JJ.,** concur.

Please note:

The court has recorded its own entry this date.

12