[Cite as *In re G.C.*, 2018-Ohio-2900.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE:  G.C.

:

:

:

APPEAL NOS. C-180212
C-180257
TRIAL NO. F17-318Z

*O P I N I O N.*

Appeals From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  July 25, 2018

*Phyllis Schiff*, for appellant Mother,

*ProKids* and *Jeffrey A. McCormick*, for appellant Guardian Ad Litem,

*Elizabeth Powers*, for appellee G.C.,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Elizabeth Buller*, Assistant Prosecuting Attorney, for appellee Hamilton County Department of Job and Family Services.

**MYERS, Judge.**

{¶1}    Both mother[1] and the guardian ad litem for G.C. have appealed from the juvenile court's entry granting permanent custody of G.C. to the Hamilton County Department of Job and Family Services ("HCJFS").  G.C. has not separately appealed, but supports the arguments raised by mother and the guardian ad litem.  HCJFS asks this court to affirm the juvenile court's judgment.

### *Factual Background*

{¶2}    On February 7, 2017, HCJFS filed a complaint alleging that G.C. was neglected, abused, and dependent, and seeking permanent custody of G.C.  When the complaint was filed, G.C. was 14 years old.  At an adjudicatory hearing before a juvenile court magistrate, mother stipulated to the following allegations in the complaint:

1.  [G.C.] was placed in the permanent custody of the Clermont Co. public children's services agency.  Paternal grandmother, [mother], adopted her.

2.  On September 22, 2016, HCJFS received a report that [G.C.'s] biological uncle, [J.C.], who resided in the home with [G.C.] and [mother], was arrested for Pandering Sexually Oriented Material Involving a Minor.  Police discovered thousands of videos and photos of minor females, including [G.C.], her half-sister, and one of their friends.  The material spanned over a seven year time period.  [J.C.] admitted to victimizing the girls and has been indicted on six counts of Rapes [sic] and six counts of Sexual Pandering.  He is currently

---

[1] Mother is G.C.'s adoptive parent, but is also her paternal grandmother.

incarcerated. [G.C.] has disclosed sexual abuse during forensic interviews.

* * *

4. [Mother] was aware that [J.C.] was a registered sex offender from a Child Enticement conviction in 2002. [Mother] admitted to knowing that [J.C.] had a problem with child pornography but "did not think he would do anything to [G.C.]" * * *.

5. [G.C.] had been placed on a safety plan in September 2016. On February 5, 2017 the child left the safety plan provider's residence and went to stay with [mother]. When an alternate placement could not be found, the HCJFS obtained an emergency order on February 6, 2017.

{¶3} HCJFS then presented testimony from Josh Ramel, a special agent with the Ohio Bureau of Criminal Investigation in the Crimes Against Children Unit. Agent Ramel testified about his investigation of J.C., including J.C.'s online sharing of child pornography.

{¶4} Agent Ramel interviewed mother during his investigation. Mother admitted that J.C. had a child pornography problem and that she was aware that J.C. had several computers containing child pornography, but she denied having any knowledge that J.C. had harmed G.C. Agent Ramel testified that J.C. had lived with mother for approximately a decade prior to his apprehension. Mother told Agent Ramel that she had once caught J.C. with his pants part way down with G.C. and G.C.'s half-sister. J.C. told mother that the girls had accidentally pulled his pants down. Mother continued to allow J.C. to live in her home after that incident. Agent Ramel testified that mother told him that J.C. moved out of her home in late 2015 after he was caught recording a friend of G.C.'s in the shower with a hidden cell phone.

{¶5} The magistrate adjudicated G.C. abused, dependent, and neglected. The magistrate's order noted that G.C. had been "AWOL" at the time of the

3

adjudicatory hearing, but that she had since been placed in the home of a family friend and had remained in the placement.

{¶6}   In July 2017, the magistrate conducted an in camera hearing with G.C. G.C. told the magistrate that she wished to live with her mother.  G.C. did not believe that mother was aware that J.C. had abused her, and stated that mother made J.C. move out upon learning of the abuse.  G.C. reported a close bond with her mother and a desire for unsupervised visitation.  G.C. told the magistrate that she would do whatever was needed in order to return to her mother's care, including attend therapy.

{¶7}   A dispositional hearing was conducted over the course of three days. Dr. Emily Davis, a licensed psychologist, testified that she had conducted a Sexual Offender Diagnostic Assessment ("SODA") on mother.  As part of the SODA, mother completed two personality assessments.   The SODA, which was admitted into evidence, summarized Dr. Davis's interview with mother.  Mother told Dr. Davis that when her oldest son was approximately 10 or 11 years old, he had sexually abused her two younger sons and the daughter of her then boyfriend.  This son, G.C.'s father, continued to be "in and out of prison," but had not incurred any additional sexual offenses.  As an adult, he occasionally stayed overnight at mother's residence, but never resided there.

{¶8}   While mother denied knowing that J.C. had abused G.C., she discussed with Dr. Davis other incidents involving J.C.  She told Dr. Davis that J.C. had a prior conviction for a sexual offense involving a child and had been required to register as a sexual offender.  Mother had made J.C. move out of her residence while she was seeking custody of G.C., but she let him return after custody was secured.  Mother acknowledged that allegations had been raised against J.C. pertaining to other victims, but stated that no charges resulted from the allegations and that she had never been directed to have J.C. move out of her home.  Mother had also observed G.C. and another child "getting on [J.C.'s] knees and riding them" while J.C.'s pants

4

were "a little bit down but not all the way." Mother admitted knowing that J.C. viewed child pornography on his computer. But despite knowing of J.C.'s predilection towards child pornography, mother told Dr. Davis that she did not believe he would harm G.C. She told Dr. Davis that J.C. moved out of her home in late 2015, after she learned that he had recorded a friend of G.C.'s in the bathroom.

{¶9}   Dr. Davis testified that the SODA indicated that mother suffered from a recurrent major depressive disorder and an unspecified personality disorder with significant schizoid features, and that these schizoid features could cause mother to "be that passive observer, one who may not be able to assert appropriate boundaries" and to have an "inability to ensure maybe self-protection for herself even and for those around her in the context of relationships." Dr. Davis recommended that mother participate in mental-health counseling.

{¶10} HCJFS caseworker Gloria Campbell testified that she had been responsible for G.C.'s case since March 2017. At the time that Campbell took over case responsibility, G.C. had been AWOL from her foster home because she wanted to be placed closer to mother. Campbell explained that the agency had concerns about the ongoing abuse that had occurred in mother's home and about G.C.'s education and the amount of school that she had missed. The agency was also concerned that G.C. had not been receiving therapy to deal with her sexual abuse. Campbell testified that mother needed to take responsibility for what had occurred in her home and to attend weekly therapy, and that she was concerned that mother was only attending therapy when mother felt that it was needed.

{¶11} Campbell explained that G.C. was currently placed with a family friend, but that the friend was not being investigated as an option for a legal custodian. Nor were any other relatives being investigated as potential legal custodians for G.C. Campbell testified that G.C. did not want to be adopted and wanted to return to her mother's care, but that based on mother's history of

continually allowing perpetrators into her home, HCJFS did not believe mother would be able to protect G.C.

{¶12} Anna Hazard, G.C.'s guardian ad litem, testified that she believed a grant of temporary custody to HCJFS, and ultimately reunification with mother, was in G.C.'s best interest. Hazard explained that G.C. did not want to be separated from mother and that G.C. has expressed that she will leave any placement that she does not approve of.

{¶13} The magistrate issued a decision granting permanent custody of G.C. to HCJFS. Mother, the guardian ad litem, and G.C.'s appointed attorney filed objections to that decision. The juvenile court determined that G.C. could not and should not be placed with mother within a reasonable time and that a grant of permanent custody was in G.C.'s best interest. It overruled all objections and adopted the magistrate's decision.

{¶14} In one assignment of error, mother argues that the juvenile court erred as a matter of law by granting HCJFS's motion for permanent custody. In two assignments of error, G.C.'s guardian ad litem argues that the juvenile court failed to consider the statutory best interest factors, and that the juvenile court erred in finding that a grant of permanent custody was in G.C.'s best interest. As these arguments are related, we address them together.

### Legal Analysis

{¶15} Under former R.C. 2151.353(A)(4),[2] after a child is adjudicated abused, neglected, or dependent, the juvenile court may commit the child to the permanent custody of a children services agency if it determines under R.C. 2151.414(E) that the child cannot or should not be placed with one of the child's parents within a

---

[2] We will apply the version of the statute that was in effect on the date that the motion for permanent custody was filed. *See In re C.M.*, 1st Dist. Hamilton Nos. C-150365 and C-150396, 2015-Ohio-3971, ¶ 13.

6

reasonable time, and it determines that permanent custody is in the best interest of the child in accordance with R.C. 2151.414(D)(1). The findings required by former R.C. 2151.353(A)(4) must be supported by clear and convincing evidence. *In re Kh.M.*, 6th Dist. Lucas Nos. L-16-1199 and L-16-1223, 2017-Ohio-8706, ¶ 21.

{¶16} When reviewing the sufficiency of the evidence, we must examine the record to determine if the juvenile court had sufficient evidence before it to satisfy the clear-and-convincing standard. *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46. We may not substitute our judgment for that of the juvenile court where its judgment is supported by competent and credible evidence. *Id.* In reviewing a challenge to the weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *In re A.B.*, 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 16, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12.

{¶17} Competent and credible evidence supports the juvenile court's determination under R.C. 2151.414(E) that G.C. could not or should not be placed with mother within a reasonable time. HCJFS requested that mother attend weekly therapy, but mother only attended therapy when she felt that it was necessary. *See* R.C. 2151.414(E)(1). And mother's mental illnesses, including a major depressive disorder and a personality disorder with schizoid features, are so severe that they prevent mother from providing an adequate permanent home for G.C. *See* R.C. 2151.414(E)(2). Dr. Davis's testimony explained how mother's schizoid personality traits could render her a passive observer who is unable to assert appropriate boundaries and ensure protection for G.C.

{¶18} Further, the record indisputably establishes that mother had knowledge that J.C. had a predilection for child pornography; that he stored such

pornography on his computer; that he had a prior conviction for a sexual offense and had been required to register as a sexual offender; and that she had witnessed him in a compromising and questionable encounter with G.C. and her half-sister. Despite this knowledge, mother continued to allow J.C. to live in her home and have access to G.C. *See* R.C. 2151.414(E)(16).

{¶19} As to the juvenile court's best interest determination, we find no merit to the argument that the court failed to consider the statutory best interest factors. This court has held, "[w]hile a court does not have to enumerate each factor under R.C. 2151.414, 'there must be some indication on the record that all of the necessary factors were considered.' " *In re N.G.*, 1st Dist. Hamilton Nos. C-130684 and C-130685, 2014-Ohio-720, ¶ 12, quoting *In re G.B.,* 10th Dist. Franklin No. 04AP-1024, 2005-Ohio-3141, ¶ 17. On this record, we cannot find the court failed to consider the statutory best interest factors or engage in the requisite analysis.

{¶20} Competent and credible evidence supports the juvenile court's determination that a grant of permanent custody is in G.C.'s best interest under R.C. 2151.414(D)(1). Mother's schizoid personality traits prevented her from adequately protecting G.C., and resulted in her allowing not only J.C. to live in her home, but in allowing her oldest son, who also had a prior conviction for a sexual offense, to visit and occasionally stay overnight. *See* R.C. 2151.414(D)(1)(a). G.C. has a need for a legally secure placement, which can only be achieved with a grant of permanent custody to HCJFS, as neither the family friend nor any family members were being considered for a permanent placement. *See* R.C. 2151.414(D)(1)(d).

{¶21} We further find that the juvenile court's grant of permanent custody to HCJFS was not against the manifest weight of the evidence. G.C. undeniably wants to return to her mother's care, and her guardian ad litem feels that reunification with mother is in G.C.'s best interest. *See* R.C. 2151.414(D)(1)(b). But ample evidence supports both the juvenile court's findings that G.C. could not or should not be returned to mother's care within a reasonable time and that a grant of permanent

custody was in G.C.'s best interest. This is not the rare case in which the court lost its way and created such a manifest miscarriage of justice that its judgment must be reversed. *See In re A.B.*, 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, at ¶ 16.

{¶22} Mother's assignment of error, and the guardian ad litem's first and second assignments of error, are overruled.

### Conclusion

{¶23} Having overruled all assignments of error, we affirm the judgment of the juvenile court granting permanent custody of G.C. to HCJFS.

Judgment affirmed.

CUNNINGHAM, P.J., and ZAYAS, J., concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.